# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GILBERT G. MENNA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0509-MTZ |
| | ) | |
| ANDREW J. WEIDHAAS, JOANNE | ) | |
| WEIDHASS, and MIRADX, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS'
## MOTION FOR JUDGMENT ON THE PLEADINGS

WHEREAS, having considered Defendants Andrew J. Weidhaas, Joanne Weidhass, and MiraDx, Inc.'s Motion for Judgment on the Pleadings (the "Motion"),[1] the parties' briefing on the Motion,[2] and oral argument held on April 3, 2023, it appears:[3]

---

[1] Docket Item ("D.I.") 9 [hereinafter "Mot."].

[2] D.I. 10 [hereinafter "OB"]; D.I. 14 [hereinafter "AB"]; D.I. 21 [hereinafter "RB"].

[3] D.I. 25; D.I. 26 [hereinafter "Hr'g Tr."]. I draw the following facts from the Complaint, available at D.I. 1 [hereinafter "Compl."], as well as the documents integral to it, including those incorporated by reference, and the Defendants' answer, available at D.I. 8 [hereinafter, "Ans."]. *See, e.g.*, *Jiménez v. Palacios*, 250 A.3d 814, 827 (Del. Ch. 2019) ("The pleadings to which this Court may look are not limited to complaints or counterclaims, but also include answers and affirmative defenses. On a Rule 12(c) motion, the Court may consider documents integral to the pleadings, including documents incorporated by reference and exhibits attached to the pleadings, and facts subject to judicial notice." (footnotes and citations omitted)), *aff'd*, 237 A.3d 68, 2020 WL 4207625 (Del. 2020) (TABLE); *7547 P'rs v. Beck*, 682 A.2d 160, 163 (Del. 1996) ("[W]here there is a corporate claim based upon inadequate or misleading disclosures, a court may refer to

A.     Defendant MiraDx, Inc. ("MiraDx" or the "Company") is a Delaware corporation that "was founded and continues to conduct cancer research aimed at developing treatments based on a class of genetic biomarkers."[4] "As a research and development company, MiraDX was not profitable and did not provide any returns

the allegedly deficient corporate document to determine what was disclosed." (citing *In re Santa Fe Pac. Corp. Litig.*, 669 A.2d 59, 70 (Del. 1995))).

    Several documents Defendants appended to their Answer are integral to the Complaint: Exhibits 2 through 5, Exhibits 7 through 10, the Stock Repurchase Agreement submitted as part of Exhibit 12, and Exhibits 14 and 15. *See Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *1 n.1 (Del. Ch. July 24, 2009) (identifying an email chain, a portion of which was quoted in the complaint, as integral to a claim for fraudulent misrepresentation and concluding that "the court must view the quote in context to properly examine whether the plaintiffs allege a valid claim"); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint." (citing *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005))), *aff'd*, 58 A.3d 414 (Del. 2013); *see, e.g.*, Compl. ¶¶ 16–17, 51 (quoting from the November 2020 Update attached to the answer as Exhibit 2); *id.* ¶¶ 21–22 (quoting from the email exchange attached to the answer as Exhibit 3); *id.* ¶ 23 (quoting from the email exchange attached to the answer as Exhibit 4); *id.* ¶ 24 (quoting from the email exchange attached to the answer as Exhibit 5); *id.* ¶ 27 (quoting from the email exchange attached to the answer as Exhibit 7); *id.* ¶¶ 30, 34 (quoting from the email exchange attached to the answer as Exhibit 8); *id.* ¶ 35 (quoting from the email exchange attached to the answer as Exhibit 9); *id.* ¶ 33 (quoting from the email exchange attached to the Answer as Exhibit 10); *id.* ¶ 42 (expressly referring to and discussing the Stock Repurchase Agreement dated December 4, 2020, which is attached to the answer within Exhibit 12); *id.* ¶¶ 44, 46 (expressly referring to and discussing the October 5, 2021 repurchase offer, which is attached to the answer as Exhibit 14); *id.* ¶¶ 45–46 (expressly discussing Mr. Menna's acceptance of the October 5, 2021 repurchase offer, which is attached to the answer as Exhibit 15). I decline to consider the other exhibits. *See* Ct. Ch. R. 12(c). Accordingly, I reject Mr. Menna's request to convert the Motion to a motion for summary judgment, and do not reach his argument that he needs discovery under Rule 56(f). *Id.*; *cf. In Re Camping World Hldgs., Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *1 (Del. Ch. Jan. 31, 2022), *aff'd*, 285 A.3d 1204 (Del. 2022).

[4] Ans., Ex. 12 at 2–8 [hereinafter "SRA"] at preamble; Compl. ¶ 6.

2

to its investors between 2009 and 2020."[5]  In March 2020, the Company began developing a COVID-19 PCR test.[6]

B.    Defendant Dr. Joanne Weidhaas is a founder of MiraDx and Chairperson of its board of directors.[7]  Dr. Weidhaas is an oncologist and professor at the David Geffen School of Medicine at UCLA and head of translational research in its Department of Therapeutic Radiology, where she specializes in women's health issues.[8]

C.    Defendant Andrew J. Weidhaas is, and has been at all relevant times, a MiraDx director.[9]  Mr. Weidhaas is a partner at a prominent international law firm.[10] Dr. and Mr. Weidhaas are married.[11]

D.    Plaintiff Gilbert G. Menna is a senior partner and former member of the executive and management committees at the same prominent international law firm as Mr. Weidhaas.[12]  Mr. Menna "specializes in REITs, M&A practice and real estate

---

[5] Compl. ¶ 13.

[6] *Id.* ¶ 15.

[7] *Id.* ¶ 3.

[8] Ans. ¶ 3.

[9] Compl. ¶ 4.

[10] *See id.* ¶ 4; Ans. ¶ 4.

[11] Compl. ¶ 5.  The Court uses honorifics in pursuit of clarity.

[12] Ans. ¶ 4.

tax."[13]  Mr. Menna and Mr. Weidhaas have been partners at their law firm for over twenty-eight years.[14]  Mr. Menna is a former stockholder of MiraDx.[15]

E.    In 2009, Mr. Menna invested $100,000 to acquire 100,000 series A shares ("Series A Shares") of MiraDx.[16]  In 2011, Mr. Menna participated in a MiraDx bridge note financing round in which he purchased $200,000 worth of bridge notes (the "Bridge Notes").[17]  The Bridge Notes provided for payable-in-kind ("PIK") interest through the issuance of additional Bridge Notes, all of which were convertible into Series A Shares.[18]  In conjunction with this financing round, Mr. Menna also acquired a Series A warrant that was exercisable into 93,037.50 Series A Shares at a $1.00 per share strike price.[19]

F.    Each year, the Company provided an annual investor update to stockholders sharing updates about its cancer research, but little to no financial information.[20]  On November 15, 2020, Dr. Weidhaas distributed the Company's

---

[13] *Id.*

[14] Compl. ¶ 4.

[15] *Id.* ¶ 2.

[16] *Id.* ¶ 8.

[17] *Id.* ¶ 9.

[18] *Id.*

[19] *Id.* ¶ 10.

[20] *Id.* ¶ 14.

4

2020 investor update (the "November 2020 Update").[21] That update reported that starting in March 2020, the Company "pivoted all of [its] lab operations, and invested [its] remaining capital in additional high-throughput machinery, established and validated [its] own COVID-19 PCR test based on CDC-provided materials and protocols, and started offering COVID-19 testing on a commercial basis on April 9th, 2020."[22] MiraDX "operated under an FDA emergency use authorization until August 31, 2020, when the FDA formally authorized [the Company's] test."[23] The update described populations using the Company's test and the contract it secured on July 1 with the California Department of Corrections and Rehabilitation ("CDCR").[24] The Company cautioned investors that "[w]hile the Company has a contract with CDCR, it is not a fixed commitment contract, and CDCR can effectively terminate the contract at any time. While we are not certain how long the CDCR program will continue, we have no current indication that it will end any time soon."[25]

---

[21] *Id.* ¶ 15; Ans., Ex. 2; Ans., Ex. 3.

[22] Ans., Ex. 2 at 2.

[23] *Id.*

[24] *Id.*

[25] *Id.*

G.     The November 2020 Update also summarized the progress of three pre-existing biomarker programs, and the Company's financial position.[26]

> The Company's current operational plans are to continue COVID-19 testing for as long as commercially reasonable to do so, while continuing the development of our numerous oncology and other diagnostic programs.  As a result of the redirection of the Company's resources to the commercial programs related to the pandemic, the Company estimates that the soonest its non-COVID-19 diagnostic programs will be ready for large scale commercial launch will be 2023. The Company intends to use the non-dilutive funds raised through the COVID-19 testing to fund operations and the further development of its programs, described above.[27]

H.     Finally, the update closed with an invitation for investors interested in selling their shares to contact Mr. Weidhaas.

> As a result of the cash generated by the COVID-19 testing program, the fact that many of you have been stockholders of the Company for over a decade, and the potential for tax law changes in 2021, the Company is open to the potential for liquidity to interested stockholders, although there is absolutely no obligation on this front.  If you are interested in selling your shares back to the Company, please contact A.J. Weidhaas at aweidhaas@goodwinlaw.com.[28]

I.     On November 18, Mr. Menna emailed Mr. Weidhaas asking if the November 2020 Update was "an issuer tender offer."[29]  Mr. Weidhaas responded that while the Company had considered a tender offer, it decided against it, and that

---

[26] *Id.* at 2–3.

[27] *Id.* at 3.

[28] *Id.*

[29] Compl. ¶ 20; Ans., Ex. 3.

6

the liquidity event "is pretty open and flexible."[30] Mr. Menna pressed Mr. Weidhaas: "So what do you know that I should know? Can we chat, and is it all holders best price?"[31]

J.      Mr. Weidhaas responded the next day attaching the Company's most recent financials, summarizing Mr. Menna's investment, and offering to discuss those topics with Mr. Menna the next day.[32] His email did not address taxes. Mr. Menna replied, again pressing for more information:

> Can I have a sense of who is staying in (or is that confidential), and is this an all or none proposition for each investor? I wonder whether the entire equity amount is subject to qualified small business gain exclusion? Copying in my wonderful BDO advisor Jessi who can help answer the tax question once we learn a little more.[33]

K.      On November 24, Mr. Menna emailed Mr. Weidhaas again, asking for the conversion documents and stating: "I am going to take advantage of the liquidity event and favorable tax treatment by year end but leave some amount in the company with the rock star doctor. Just do not know what that will be. Either $100,000 or

---

[30] Ans., Ex. 3; Ans., Ex. 4.

[31] *Id.*; Ans., Ex. 4.

[32] Ans., Ex. 4.

[33] Ans., Ex. 5 at 1 (formatting modified).

$200,000 likely."[34]  The next day, Mr. Weidhaas sent Mr. Menna "the Conversion Notice and form of Repurchase Agreement."[35]

> L.    On November 28, Mr. Menna responded,

> I recognize that you don't know who is going to tender, but based on your best thinking now, approximately what percentage of the equity in the company would each retained $100,000 interest represent?  Can you give a rough estimate?  Lastly, will all the retained common equity be participating pari passu going forward following the recapitalization?[36]

Mr. Weidhaas replied:  "Each 100,000 should represent about [0].8% going forward. All of the securities are now in the money given current value, so yes, they will be participating pro rata unless there is a significant deterioration in value."[37]  Mr. Menna wrote back with more questions, including one about the release in the stock repurchase agreement (the "Stock Repurchase Agreement"):  "Lastly, for those staying in, should the release in the stock [re]purchase agreement read differently so as not to foreclose future claims as a continuing equity investor?"[38]  Mr. Weidhaas emailed later that morning agreeing to "adjust the release language as you suggest if you are leaving some in."[39]

---

[34] Ans., Ex. 7.

[35] Ans., Ex. 8 at 2.

[36] *Id.* (formatting modified).

[37] *Id.* at 1.

[38] *Id.*

[39] *Id.*

8

M.    Mr. Menna executed a "Bridge Note Conversion Notice" electing to convert his "Convertible Promissory Notes . . . in the original principal amount(s) of $200,000.00 . . . into 372,150 shares of Series A Preferred Stock."[40]

N.    On December 3, Mr. Menna emailed his tax advisor and Mr. Weidhaas to return his executed Stock Repurchase Agreement, "mak[ing] note of the change expected in section 7 (release) in the event [he] le[ft] the original 2009 investment in the Company."[41] Mr. Menna shared that he was "leaning on" keeping his original 2009 investment in the Company "if it is clear that [he] will be reducing [his] voting position by significantly more than 20% following the completion of the tender offer," but asked Mr. Weidhaas if he was available "to ask a few additional questions about the capitalization of the Company following the tender offer."[42] He closed the email with a note to his advisor: "Jessi, I will explain this package to you when we next speak as it creates a Qualified Small Business Stock [("QSBS")] exemption form [sic] gain in 2020."[43] Mr. Weidhaas responded to Mr. Menna's questions about any holdings he was "leaving in" the Company, confirming that Mr. Menna's "voting interest will go down by more than 20%, even if [he kept] 100,000 shares."[44]

---

[40] Compl. ¶ 42; Ans. ¶ 42.

[41] Ans., Ex. 9.

[42] *Id.* at 1.

[43] *Id.*

[44] Ans., Ex. 10 at 2.

9

O.	Mr. Menna emailed back:

The only other questions I have relate to understanding (I) who the remaining investors are following the tender, and (II) whether, with the other cofounder liquidating, Joanne would be the only reminding [sic] knowledgeable doctor and researcher (expert if you will) running the Company.

So I can chat with you about these last questions at your convenience, whenever that might work for you.

I have moved my charitable conservation restriction to January of next year as I will receive the tax benefits from that event in 2021 when making my estimated tax payments. I have therefore eliminated that concern for the 2020 tax year.[45]

Mr. Weidhaas replied:

1. The other co-founder, Frank Slack, is retaining 100,000 shares (selling about 1mm). Note that he is a PhD, not MD [embedding link to Dr. Slack's Harvard bio].

2. The other major investor of note is Roy Vagelos, former CEO of Merck. He also acts as an advisor (he is Jonie's uncle and mentor). He has invested $1.5mm.

3. Other investors are mainly friends and family with little or no biotech industry expertise.[46]

Mr. Menna then notified Mr. Weidhaas that he decided to "stay in for the original investment in 2009. So [they would] simply need to modify the release in what [Mr.

---

[45] *Id.* at 1–2.

[46] *Id.* at 1.

10

Menna] signed."[47] The next day, December 4, Mr. Menna sent the modified release language.[48]

P. On December 4, Mr. Menna and MiraDx executed the Stock Repurchase Agreement, by which MiraDx repurchased 372,150 shares of Series A Preferred Stock that were converted from Mr. Menna's Bridge Notes and 93,037.50 shares of Series A Preferred Stock converted from Mr. Menna's warrants for $837,337.50 total consideration.[49] This amounted to $2.00 per Series A Share, and $1.00 per share of Series A preferred stock or "Warrant Share."[50] Mr. Menna did not sell his remaining 100,000 shares of Series A Preferred Stock at that time.[51]

Q. Section 5 of the Stock Repurchase Agreement includes representations and warranties from Mr. Menna as "Seller," including:

---

[47] *Id.*

[48] Ans. ¶ 42; SRA § 7.

[49] SRA; *id.*, Ex. A.

[50] SRA, Ex. A.

[51] Ans., Ex. 9 at 1; SRA, Ex. A; Compl. ¶ 43.

c. <u>Investment Representations</u>. Seller acknowledges and agrees that (x) he has independently investigated and evaluated the value of the Securities, and the financial condition and affairs of the Company without reliance upon any representation or warranty regarding such information from the Company or any of its respective subsidiaries or affiliates, (y) neither the Company, nor any of its respective subsidiaries, affiliates, attorneys, accountants or financial or other advisors has furnished any information to him that was used by him in determining whether to sell the Securities in exchange for the Consideration and (z) based upon his own independent analysis, together with information obtained from sources other than the Company and its respective subsidiaries and affiliates, he has reached his own business decision to effectuate the sale of Securities contemplated hereby. Seller represents and warrants that he has had access to adequate information regarding the terms of this Agreement, the scope and effect of the releases set forth herein, and all other matters encompassed by this Agreement, to make an informed and knowledgeable decision with regard to entering into this Agreement.

d. <u>Advice of Counsel</u>. Seller acknowledges and agrees that he or she had the opportunity to seek the advice of competent legal counsel with respect to his [or her] decision to enter into this Agreement, including, without limitation, the release provided for herein.

e. <u>Independent Tax Advice</u>. Seller acknowledges and agrees that he received his own independent tax advice prior to entering into this Agreement and has not relied on any tax advice from the Company or its representatives.[52]

Section 10 includes an integration provision.[53]

---

[52] SRA §§ 5(c)–(e).

[53] *Id.* § 10 ("This Agreement and the other writings and agreements referred to herein or delivered pursuant hereto contain the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior arrangements or understandings between such parties with respect thereto.").

R.     Section 7 of the Stock Repurchase Agreement includes the release that Mr. Menna and Mr. Weidhaas negotiated.[54]  As revised by Mr. Menna, Section 7 (the "Release") states:

> For and in consideration of the Consideration, and the additional covenants and promises set forth herein, Seller, effective upon Closing, on behalf of himself and his assigns, heirs, beneficiaries, creditors, representatives, agents and direct and indirect affiliates (the "Seller Releasing Parties"), hereby agrees to fully and finally release, acquit and forever discharge the Company and its respective subsidiaries and affiliates, and each of their respective officers, directors, partners, general partners, limited partners, managing directors, members, stockholders, trustees, shareholders, representatives, employees, principals, agents, affiliates, parents, subsidiaries, joint ventures, predecessors, successors, assigns, beneficiaries, heirs, executors, personal or legal representatives, insurers and attorneys of any of them, (collectively, the "Company Released Parties") from any and all actions, debts, claims, counterclaims, demands, liabilities, damages, causes of action, costs, expenses, and compensation of every kind and nature whatsoever, past, present, or future, at law or in equity, whether known or unknown, which such Releasing Parties, or any of them, had, has, or may have had at any time in the past until and including the date of this Agreement against the Company Released Parties, or any of them, including by not limited to any claims which relate to or arise out of such Seller Releasing Party's prior relationship with the Company Released Parties or its rights or status as a stockholder, employee, officer or director of the Company Released Parties and further including without limitation any claims of fraud or fraudulent inducement in connection with the negotiation, execution and performance of this Agreement and any other documents and agreements to which Seller is a party in connection with the transactions contemplated hereby (all of the foregoing collectively referred to herein as the "Claims").  In executing this Agreement, Seller acknowledges and agrees that the Company may from time to time enter into agreements for additional types of financing, and also may pursue acquisitions, which may result in or reflect an increase or decrease in

---

[54] *Id.* § 7; Ans. ¶ 42.

equity value or enterprise value from that which is implied by the Consideration, and that any and all claims arising from or relating to such transactions or such increases or decreases in equity value or enterprise value are encompassed within the scope of this release, and that the sole exceptions to the scope of this release are for claims arising after the date hereof directly under this Agreement in accordance with their respective terms. Seller further agrees, effective upon the Closing, not to institute any litigation, lawsuit, claim or action against the Company or any Company Released Party with respect to any and all claims released pursuant to <u>Section 7</u>. This release does not <u>apply to</u> ~~release~~ Seller's ~~rights to the~~ Retained Securities.[55]

S.      On October 5, 2021, the Company issued an "Offer to Purchase" (the "October 2021 Repurchase Offer").[56] In response to the October 2021 Repurchase Offer, Mr. Menna tendered his remaining 100,000 Series A Shares for $15.00 per share.[57]

T.      On June 14, 2022, Mr. Menna filed his complaint (the "Complaint"), asserting two counts against Defendants for breach of fiduciary duty (Count I) and fraudulent inducement (Count II).[58]

U.      On August 16, Defendants filed their answer and affirmative defenses (the "Answer"), and moved for judgment on the pleadings.[59] Defendants contend

---

[55] SRA § 7 (underlining, double underlining, and strikethrough in original).

[56] Compl. ¶ 44; Ans., Ex. 14.

[57] Compl. ¶ 45; Ans., Ex. 15.

[58] Compl.

[59] Ans.; Mot.; OB.

14

the Release bars Mr. Menna's claims.[60] As to Count I, Defendants also assert they do not owe fiduciary duties to Mr. Menna; and if they did, they did not breach them. As to Count II, Defendants also argue Mr. Menna's fraud claim is not well pled under Court of Chancery Rule 9(b), does not allege any wrongdoing by Dr. Weidhaas, and is barred by the Stock Repurchase Agreement's antireliance provisions.[61]

V. "This court will grant a motion for judgment on the pleadings pursuant to Rule 12(c) when there are no material issues of fact and the movant is entitled to judgment as a matter of law."[62] "[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[63] "While the nonmoving party is entitled to 'all reasonable inferences that logically flow from the face of the complaint,' the

---

[60] *E.g.*, Ans. at 29 ("First Affirmative Defense. Plaintiff's claims are barred, in whole or in part, by the release that Plaintiff agreed to in the Stock Repurchase Agreement."); OB at 21–24.

[61] *E.g.*, Ans. at 29 ("Fourth Affirmative Defense. The Complaint fails, in whole or in part, to state a claim upon which relief can be granted."); *id.* ("Second Affirmative Defense. Plaintiff's claims are barred, in whole or in part, by other provisions of the Stock Repurchase Agreement, to which Plaintiff agreed."); *id.* at 30 ("Sixth Affirmative Defense. Plaintiff's claims may be barred, in whole or in part, because Plaintiff did not rely upon Defendants' alleged conduct to his detriment and because there is no causal relationship between the alleged misconduct and alleged damages."); OB at 25–36.

[62] *Lillis v. AT & T Corp.*, 904 A.2d 325, 329 (Del. Ch. 2006) (citing *McMillan v. Intercargo Corp.*, 768 A.2d 492, 499–500 (Del. Ch. 2000)).

[63] *Id.* at 329–30 (internal quotation marks omitted) (footnote omitted).

'[C]ourt is not . . . required to accept as true conclusory allegations without specific supporting factual allegations.'"[64]  "[T]he trial court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[65]  "In order to award judgment on the pleadings in favor of the defendants, the Court must conclude either that plaintiffs have utterly failed to plead facts supporting an element of the claim or that under no reasonable interpretation of the facts alleged in the complaint (including reasonable inferences) could plaintiffs state a claim upon which relief might be granted."[66]

W.  Court of Chancery Rule 9(b) requires a plaintiff to allege the "circumstances constituting fraud . . . with particularity."[67]  The relevant circumstances are "the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[68]

---

[64] *In re Seneca Invs. LLC*, 970 A.2d 259, 262 (Del. Ch. 2008) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001), and then *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[65] *Id.* (internal quotation marks omitted) (quoting *Malpiede*, 780 A.2d at 1083).

[66] *Ross Hldg. & Mgmt. Co. v. Advance Realty Grp., LLC*, 2010 WL 1838608, at *5 (Del. Ch. Apr. 28, 2010) (citing *Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood*, 752 A.2d 1175, 1179–80 (Del. Ch. 1999)).

[67] Ch. Ct. R. 9(b).

[68] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207–08 (Del. Ch. 2006) (collecting authorities), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE).

X.	Defendants contend Mr. Menna voluntarily released all of his claims in the Stock Repurchase Agreement because its Release covers "any and all actions, debts, claims . . . of every kind and nature whatsoever, past, present, or future, at law or in equity, whether known or unknown" that he had or may have had through and including the date of the Stock Repurchase Agreement.[69]

Y.	When a pleadings-stage dispositive motion "relies upon affirmative defenses, such as waiver and release, the Court may dismiss a claim if the plaintiff includes in its pleadings facts that incontrovertibly constitute an affirmative defense to a claim.'"[70]	Because the Stock Purchase Agreement integral to Mr. Menna's Complaint incontrovertibly contains a release that Defendants rely on as an affirmative defense, Mr. Menna will survive Defendants' motion for judgment on the pleadings only if the Complaint contains "enough facts to plausibly suggest" that he is still entitled to the relief he seeks.[71]

---

[69] OB at 21–24; RB at 6–21; Ans., SRA § 7.

[70] *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 397 (Del. Ch. 2011) (quoting *Can. Com. Workers*, 2006 WL 456786, at *3 (Del. Ch. Feb. 22, 2006)).

[71] *Seneca*, 970 A.2d at 262 (citing *Desimone v. Barrows*, 924 A.2d 908, 929 (Del. Ch. 2007), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560–62 (2007)); *BBD Beach, LLC v. Bayberry Dunes Ass'n*, 2022 WL 763466, at *2 (Del. Ch. Mar. 10, 2022) ("On a Rule 12(c) motion, the Court may consider documents integral to the pleadings, including documents incorporated by reference and exhibits attached to the pleadings, and facts subject to judicial notice." (quoting *Jiménez*, 250 A.3d at 827)); *McMillan*, 768 A.2d at 500 (same); *cf. In re Gardner Denver, Inc.*, 2014 WL 715705, at *3 (Del. Ch. Feb. 21, 2014) ("That a document is integral can have a material effect on the disposition of a Rule 12(b)(6) motion, as it is possible for an integral document to 'effectively negate the claim as a matter of

17

Z.     "Contracts are to be interpreted as written, and effect must be given to their clear and unambiguous terms."[72]   "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[73]  "When a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words contained in the contract."[74]

AA.   "Delaware courts recognize the validity of general releases."[75]   "A release is valid if it is unambiguous, not unconscionable, and not against public

---

law.'" (footnote omitted) (quoting *Malpiede*, 780 A.2d at 1083)); *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del. Ch. 2003) ("Under Rule 12(b)(6), a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations." (footnote omitted)); *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *5 (Del. Ch. Sept. 27, 2013) (concluding a claim was time-barred under laches because the contract provisions at issue were previously disclosed to stockholders in an SEC filing found integral to the complaint).

[72] *Willie Gary LLC v. James & Jackson LLC*, 2006 WL 75309, at *5 (Del. Ch. Jan. 10, 2006) (footnote omitted), *aff'd*, 906 A.2d 76 (Del. 2006).

[73] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.3d 1228, 1232 (Del. 1997) (citing *Rhone–Poulenc v. Am. Motorists Ins.*, 616 A.2d 1192, 1196 (Del. 1992)).

[74] *Liquor Exch., Inc. v. Tsaganos*, 2004 WL 2694912, at *2 (Del. Ch. Nov. 16, 2004) (citing *Myers v. Myers*, 408 A.2d 279, 281 (Del. 1979)).

[75] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010) (citing *Chakov v. Outboard Marine Corp.*, 429 A.2d 984, 985 (Del. 1981)); *see also Corp. Prop. Assocs. 6 v. Hallwood Grp. Inv.*, 817 A.2d 777, 779 (Del. 2003) ("Under settled Delaware law, a general release is one which is intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind . . . .  Such general releases are in common use . . . . Their validity is unchallenged." (cleaned up) (quoting *Hob Tea Room v. Miller*, 89 A.2d 851, 856 (Del. 1952))).

18

policy."[76]  "When determining whether a release covers a claim, 'the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document.'"[77]  "If [a] claim falls within the plain language of the release, then the claim should be dismissed."[78]  "The only circumstances in which a release would be set aside are 'fraud, duress, coercion, or mutual mistake.'"[79]  But "unless a Plaintiff was precluded from reading the release, a 'release will not lightly be set aside where the language is clear and unambiguous.'"[80]  "[T]he party seeking to nullify the release bears the burden of demonstrating by clear and convincing evidence that the release is invalid."[81]

---

[76] *Ketler v. PFPA, LLC*, 2015 WL 3540187, at *2 (Del. Super. June 3, 2015), *aff'd*, 132 A.3d 746 (Del. 2016).

[77] *Seven Invs.*, 32 A.3d at 396 (quoting *Corp. Prop. Assocs. 6*, 817 A.2d at 779).

[78] *Id.* (citing *Deuley*, 8 A.3d at 1163–65).

[79] *Seiden v. Kaneko*, 2017 WL 1093937, at *3 (Del. Ch. Mar. 22, 2017) (quoting *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 2012 WL 1409013, at *6 (Del. Super. Apr. 4, 2012), *aff'd*, 55 A.3d 330 (Del. 2012)), *aff'd sub nom. Seiden v. Shu Kaneko*, 177 A.3d 69 (Del. 2017).

[80] *Desrivieres v. Richard*, 2016 WL 241373, at *2 (Del. Super. Jan. 14, 2016) (quoting *Bernal v. Feliciano*, 2013 WL 1871756, at *3–4 (Del. Super. May 1, 2013)).

[81] *Seiden*, 2017 WL 1093937, at *3 (quoting *Riverbend Cmty.*, 2012 WL 1409013, at *6); *Alston v. Alexander*, 2011 WL 1225555, at *3 (Del. Super. Mar. 29, 2011) ("A lawsuit may also proceed against a released party if the plaintiff can show that the release was procured by fraud, duress, or coercion." (citing *Webb v. Dickerson*, 2002 WL 388121, at *6 (Del. Mar. 11, 2022))), *aff'd*, 49 A.3d 1192 (Del. 2012).

**IT IS HEREBY ORDERED** this 28th day of July, 2023, that:

1. The parties join issue on whether release and antireliance provisions in the Stock Repurchase Agreement bar Mr. Menna's claims; the arguments take different shapes depending on whether the November 2020 transaction was a tender offer. These issues are narrowed substantially by Mr. Menna's fundamental failure to plead Defendants "engaged in common law or equitable fraud," or that he was fraudulently induced into converting his warrant and entering into the Stock Repurchase Agreement, in accordance with Court of Chancery Rule 9(b).[82]

2. I begin with Count II, for "Common Law, Equitable Fraud; Fraudulent Inducement." Mr. Menna does not allege Defendants made false or misleading misrepresentations with the requisite particularity, or at all. The Complaint identifies four categories of purported misrepresentations: "(i) the Company's value and prospects relating to the COVID-19 business, (ii) the Company's intended use of proceeds from the COVID-19 business to repurchase shares, (iii) the nature and timing of the risk of losing the QSBS gain exclusion on Menna's interests in the Company, and (iv) the Weidhaas[es]'[] intentions to participate in the 2020 Repurchase Offer and liquidate a substantial portion of their holdings."[83]

---

[82] Compl. ¶¶ 71–80.

[83] *Id.* ¶ 74.

3.     First, Mr. Menna claims the Company failed to provide detailed financial projections for the COVID-19 testing program and that Mr. Weidhaas stated that neither he nor the Company could reliably predict future revenues or profits from that program.[84]  That Mr. Menna would have preferred more information does not mean the information he received was false or misleading.[85] The November 2020 Update explained that the Company faced "competition from the largest labs in the world (including Quest and LabCorp)" for COVID-19 testing and "[w]hile the Company has a contract with CDCR, it is not a fixed commitment contract, and CDCR can effectively terminate the contract at any time."[86]  In response to Mr. Menna's information request, Mr. Weidhaas sent Mr. Menna the Company's most recent financial statements, which included detailed information concerning the Company's revenues and profits from COVID-19 testing.[87]  Mr. Menna does not allege these financials are false or misleading, nor does he allege that the Company's contract with CDCR was any way other than what he was told. He has failed to state a claim for fraud with respect to the first alleged misrepresentation or omission.

---

[84] *See id.* ¶ 51.

[85] *Cf. In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *9 (Del. Ch. Mar. 31, 2017) (refusing to recognize "tell me more" disclosure claims where adequate disclosures have already been provided (collecting cases)).

[86] Ans., Ex. 2 at 2.

[87] Ans., Ex. 4 (attaching financial statements).

4. Second, Mr. Menna claims the Weidhaases made materially misleading statements regarding the Company's alleged "intended use of proceeds from the COVID-19 business to repurchase shares."[88] The November 2020 Update, which is integral to the Complaint, disclosed that "[t]he Company intends to use the non-dilutive funds raised through COVID-19 testing to fund operations and further development of its programs."[89] According to Mr. Menna, this disclosure "le[d] investors to believe that funds from the COVID-19 operations would not be distributed to or used to repurchase shares from investors."[90] Not so: the very next sentence of the November 2020 Update states that "[a]s a result of the cash generated by the COVID-19 testing programs, . . . the Company is open to the potential for liquidity to interested stockholders, although there is absolutely no obligation on this front."[91] The first sentence, read together with the second, cannot reasonably be interpreted to mean that "funds from the COVID-19 operations would not be . . . used to repurchase shares from investors."[92] Mr. Menna failed to plead Defendants engaged in fraud by making a misleading statement regarding the Company's intended use of proceeds from the COVID-19 business.

---

[88] Compl. ¶ 74.

[89] Ans., Ex. 2 at 3.

[90] Compl. ¶ 51.

[91] Ans., Ex. 2 at 3.

[92] Compl. ¶ 51.

5. Third, Mr. Menna argues the Weidhaases made materially misleading statements regarding "the nature and timing of the risk of losing the QSBS gain exclusion on Menna's interests in the Company."[93] Mr. Menna alleges Mr. "Weidhaas led Menna and other investors to believe that the 'potential for tax law changes in 2021' referenced in the November 2020 Update related to legislative changes that would have caused MiraDx equity to lose its QSBS status."[94] Mr. Menna never identifies a statement in his Complaint by either Weidhaas that could have reasonably generated this belief.[95] Rather, Mr. Menna alleges his own "belie[f that] he needed to take advantage of QSBS quickly" and that Mr. Weidhaas "did nothing to disabuse Menna of his mistaken belief."[96] Mr. Menna failed to identify any false or misleading representation concerning MiraDx's QSBS status in his

---

[93] *Id.* ¶ 74.

[94] *Id.* ¶ 26 (quoting Ans., Ex. 2 at 3); *see id.* ¶ 28.

[95] In an affidavit in support of his answering brief in opposition to the Motion, Mr. Menna states: "I understand from a recent conversation with [Al] Solecki [another partner at Goodwin Procter LLP and an investor in MiraDx], that he and certain other investors had a call with AJ Weidhaas on November 16, 2020 in which Weidhaas raised the issue of the QSBS exclusion. In my November 18, 2020 call with Mr. Solecki, he told me about Weidhaas's comments regarding the QSBS exclusion. Mr. Solecki's comments to me were the basis of my raising the QSBS issue in my November 19, 2020 email to Weidhaas that is Exhibit 5 to Defendants' Answer." D.I. 17, Affidavit of Gilbert G. Menna ¶¶ 3–4. Mr. Menna did not plead this, as is his burden under Rule 9(b). Ct. Ch. R. 9(b); *Trenwick*, 906 A.2d at 207–08 (collecting authorities); *cf. Parseghian ex rel. of Gregory J. Parseghian Revocable Tr. v. Frequency Therapeutics, Inc.*, 2022 WL 2208899, at *9 (Del. Ch. June 21, 2022) ("A Court must examine what has been alleged in the pleadings, not what a plaintiff believes has been alleged." (quoting *Gabelli & Co., Inc. v. Liggett Grp., Inc.*, 1983 WL 18015, at *3 (Del. Ch. Mar. 2, 1983), *aff'd*, 479 A.2d 276 (Del. 1984))).

[96] Compl. ¶ 27.

23

Complaint. Rule 9(b) requires more than vague assertions that Defendants somehow "led [him] to believe" that QSBS legal changes were imminent.[97] The Complaint and documents integral to it indicate Mr. Menna raised potential QSBS considerations in an email where he copied his tax advisor; Mr. Menna has pointed to no allegation or indication of any statement or response on those considerations by either Weidhaas.[98]

6. Finally, Mr. Menna claims the Weidhaases made misrepresentations or omissions concerning their "intentions to participate in the [November] 2020 Repurchase Offer and liquidate a substantial portion of their holdings."[99] He contends Mr. Weidhaas "misled [him] to believe that the Weidhaases were liquidating at least a pro rata portion of their shares to induce him to sell his shares to the Company at an uniformed and unfair price."[100] But Mr. Menna does not plead that the Weidhaases represented they were liquidating any of their shares.[101] While

---

[97] *Id.* ¶ 28; *Trenwick*, 906 A.2d at 207–08 (collecting authorities).

[98] Ans., Ex. 5 at 1. In his representations and warranties, Mr. Menna "acknowledge[d] and agree[d] that he received his own independent tax advice prior to entering into [the Stock Repurchase] Agreement and has not relied on any tax advice from the Company or its representatives." SRA § 5(e). And while he marked up Section 7, he accepted Section 5(e) as written. SRA §§ 5(e), 7; *see also* Ans., Ex. 10 at 1.

[99] Compl. ¶ 74.

[100] *Id.* ¶ 53.

[101] At argument, I asked Mr. Menna's counsel if "there [are] any oral communications alleged in the complaint in which either defendant told Mr. Menna orally that they were or were not going to cash in? Because from my perspective, I am looking at only paragraph

24

Mr. Menna alleges that he "belie[ved]" the Weidhaases "intended to sell shares back to the Company at the $2 per share price after Mr. Weidhaas complained about having to finance the Company for years,"[102] he does not allege the basis for his belief, as Rule 9(b) requires.

7.      Mr. Menna argues a November 28 email exchange "implied that everyone would be participating" in the liquidation opportunity.[103]  The exchange does not fairly support that implication.  Mr. Menna asked Mr. Weidhaas to approximate the percentage each retained $100,000 interest would represent; Mr. Weidhaas responded that "Each 100,000 should represent about [0].8% going forward."[104]  On December 3, Mr. Weidhaas explained further:  "I expect there to be no more than 13,000,000 fully diluted shares outstanding following these repurchases.  Your 100,000 would then be 0.76%."[105]  Mr. Weidhaas's predictions that Mr. Menna's remaining stake would constitute less than one percent of the

---

31, which says that Mr. Weidhaas led Mr. Menna to believe that, of the 30 million in cash, they were going to leave 10 million in, thereby confirming Mr. Menna's apparent independent understanding that they were going to cash out."  Hr'g Tr. 63.  Mr. Menna's counsel pointed to Complaint paragraphs 24, 25, and 30.  *Id*. at 63–64.  Those paragraphs do not allege any such communication.

[102] Compl. ¶ 41.

[103] AB at 31, 45.

[104] Compl. ¶ 30; Ans., Ex. 8 at 1–2.

[105] Ans., Ex. 10 at 2.

Company's remaining equity after the liquidation opportunity are inconsistent with any implication that "everyone would be participating" in that opportunity.

8. In response to these calculations, Mr. Menna argues the communications Defendants attached to their Answer "represent only a portion of the communications between the parties."[106] To the extent Mr. Menna relied on other statements that he alleges were fraudulent, it is his burden to allege them in his Complaint with particularity.[107] He failed to do so. Judgment on Count II is entered in Defendants' favor.

9. That leaves Count I for "Breach of Fiduciary Duty (Against the Individual Defendants: Materially Misleading and Incomplete, Coercive Disclosure in Connection with the 2020 Repurchase Offer.)"[108] As an initial matter, the Complaint is devoid of any specific allegations against Dr. Weidhaas. The body of the Complaint does not allege she engaged in any wrongdoing at all, and the counts resort to group pleading. Mr. Menna attempts in his answering brief to assert that because Dr. Weidhaas is Mr. "Weidhaas's wife" there is "an inference that, as director and spouse, she was aware of and approved of [Mr.] Weidhaas's interactions

---

[106] AB at 32.

[107] Ct. Ch. R. 9(b); *Trenwick*, 906 A.2d at 207–08 (collecting authorities).

[108] Compl. at 23.

26

with Menna."[109]  "Arguments in briefs do not serve to amend the pleadings."[110]  Mr. Menna failed to state a claim against Dr. Weidhaas, and judgment is entered on Count I in her favor.

10.    That leaves Count I against Mr. Weidhaas.  The Release would encompass any such claim, so long as it is valid.  Had Mr. Menna pled sufficient facts to plausibly suggest the Release was invalid, Defendants would have born the burden to demonstrate the Release's validity.[111]  Mr. Menna did not allege the Release is ambiguous, invalid, or voidable in the Complaint.  He did not acknowledge or mention the Release at all.  Defendants raised the Release as an affirmative defense on its Motion, so the burden is Mr. Menna's to "demonstrate[e] by clear and convincing evidence that the release is invalid."[112]

11.    In his opposition brief, Mr. Menna contends the Release and covenant not to sue in the Stock Repurchase Agreement "are voidable because of Defendants'

---

[109] AB at 48.

[110] *In re MeadWestvaco S'holder Litig.*, 168 A.3d 675, 688 n.68 (Del. Ch. 2017) (citation and internal quotations omitted); *Parseghian*, 2022 WL 2208899, at *8 n.75 ("Plaintiffs cannot amend their Complaint through their brief." (citing *Cal. Pub. Emps. Ret. Sys. v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002))).

[111] *Cf. Seven Invs.*, 32 A.3d at 396 ("When a plaintiff asserts that the release itself was induced by the defendant's fraud, 'the party seeking enforcement of the release bears the burden of proving that the released fraud claim was within the contemplation of the releasing party.'" (quoting *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461 (Del. 1999))).

[112] *Supra* note 82.

27

fiduciary duties"[113] that Mr. Menna contends the November 2020 transaction, as a tender offer, imposed. Relying on *Xu Hong Bin v. Heckmann Corp.*,[114] non-Delaware cases and other authorities,[115] he argues "a release should not be deemed effective unless the fiduciary establishes that (i) it disclosed all relevant information to the stockholder, and (ii) the transaction at issue, including the release, was entirely fair to the selling stockholder."[116] Mr. Menna argues the Stock Repurchase Agreement's Release does not meet this test because "Defendants failed to disclose material information in connection with the repurchase offer" and "the 2020 tender offer was coercive and not entirely fair."[117] He contends the covenant not to sue provision and antireliance provisions are invalid for the same reasons.[118]

12. *Heckmann* considered whether a corporation intended, via a general release that did not specifically identify fraud claims, to release a director from fraud claims based on conduct before and after the agreement was signed.[119] Chancellor Chandler considered New York law providing that a general release can evince an intent to release fraud claims where the releasor suspected the releasee had

---

[113] AB at 17 (capitalization altered); *id.* at 17–37.

[114] 2009 WL 3440004, at *7–9 (Del. Ch. Oct. 26, 2009).

[115] AB at 20–23.

[116] *Id.* at 18.

[117] *Id.* at 25, 33 (capitalization modified); *id.* at 25–37.

[118] *Id.* at 24, 39.

[119] *Heckmann*, 2009 WL 3440004, at *8–9.

committed fraud when agreeing to the release.[120] If the corporation did not suspect fraud, and if the release did not identify fraud, then the director had an obligation to disclose his fraud, and therefore his self-interest in the release, in order for the release to encompass that fraud.[121] If the corporation was aware of the fraud, then the release encompassed claims based on that fraud and no disclosure was required.[122] In *Heckmann*, the corporation alleged it was not aware of the director's fraudulent conduct, so the release could not compel dismissal of claims based on that fraud.

13. Here, the Release contained in the Stock Repurchase Agreement specifically and expressly covers claims for fraud and fraud in the inducement.[123] The foundational ambiguity that inspired *Heckmann*'s disclosure is not present here. Mr. Menna's intention to release Defendants from fraud claims is apparent from the plain language in the Release.

14. And as explained, Mr. Menna has failed to allege any fraud by Defendants. His disclosure arguments mirror his fraud allegations, and are similarly unsupported by his Complaint.[124] Because Mr. Menna has failed to plead any fraud

---

[120] *Id.* at *7–8.

[121] *Id.* at *6.

[122] *Id.* at *8.

[123] SRA § 7.

[124] AB at 31–37.

29

with particularity, he has failed to establish the Release is voidable as a result of fraud.[125]

15.    Mr. Menna also failed to plead that he was coerced into signing the Stock Repurchase Agreement and its Release, even under Rule 12(c)'s more lenient pleading standard.[126]  The Complaint claims only that he was "rushed into making his decision" to enter into the Stock Repurchase Agreement "because of his understanding, obtained from his discussions with [Mr.] Weidhaas that his warrant and notes had to be redeemed before December 31, 2020 to avoid losing the QSBS exemption as to those instruments."[127]  This is not coercion, for several reasons. First, as explained, to the extent Mr. Menna was under an impression that he had to

---

[125] Ct. Ch. R. 9(b).

[126] *Seiden*, 2017 WL 1093937, at *3 (quoting *Riverbend Cmty.*, 2012 WL 1409013, at *6). "Coercion is a multi-faceted concept in Delaware law.  At least five strands of case law use the term, but the different strands involve different factual scenarios and approach the concept of coercion in different ways.  Reflexively applying language from a decision issued in one context to a factual scenario implicating a different context, just because the decision uses the term 'coercion,' can lead to erroneous results." *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *20 (Del. Ch. June 11, 2020); *id.* at *20 (Del. Ch. June 11, 2020) ("The first strand of coercion jurisprudence does not involve the conduct of fiduciaries.  It rather addresses the ability of a non-fiduciary to offer a reward or impose a penalty as a means of inducing action in an arm's-length setting."); *id.* at *23 ("A third strand of coercion jurisprudence examines whether a fiduciary has taken action to coerce its own beneficiaries.  By doing so, the fiduciary acts disloyally and violates the standard of conduct expected of fiduciaries.  The fiduciary may only avoid a finding of breach by proving that the transaction was nevertheless entirely fair, notwithstanding the fiduciary's use of coercion.").  Mr. Menna looks to a coercion standard applied to tender offers, rather than releases.  AB at 33 (quoting *Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1056 (Del. Ch. 1987)).  His arguments fail under either standard.

[127] Compl. ¶ 47.

30

act before December 31 to take advantage of the QSBS exemption, it was one of his own making.[128] Second, the language of the November 2020 Update states "the Company is open to the potential for liquidity to interested stockholders, *although there is absolutely no obligation on this front*."[129] Third, the facts as pled are inconsistent with Mr. Weidhaas pressuring Mr. Menna into making a decision.[130] He read the November 2020 Update on November 18, and agreed to sell some of his interests by November 24. He executed an agreement within the first few days of December; less than a month after he first learned about a stock buy-back, with nearly a month in the calendar year to go. Finally, Mr. Menna negotiated the Release.[131] He was not coerced into signing the Release Defendants offered, but rather signed his own bespoke Release, edited to protect his interests, and approved without pushback by Mr. Weidhaas.[132]

16. Based on the foregoing, I conclude Mr. Menna has failed to demonstrate by clear and convincing evidence that the Release is invalid due to fraud, coercion, duress, or mistake. And so, I turn to the Release to determine whether it bars a claim for breach of fiduciary duty against Mr. Weidhaas.

---

[128] *Supra* ¶ 5.

[129] Ans., Ex. 2 at 3 (emphasis added).

[130] *Alston*, 2011 WL 1225555, at *5 (declining to find coercion where "[t]o the contrary, the 'pressure,' such as it was, appeared to come from the plaintiff").

[131] SRA § 7; Ans. ¶ 42.

[132] Ans. ¶ 42.

17. Under the undisputedly plain and unambiguous language of the Release, assuming Mr. Weidhaas owed fiduciary duties, Count I against him is within the scope of the Release.[133] Mr. Menna agreed to

> fully and finally release, acquit and forever discharge the Company and its . . . officers, directors, . . . stockholders, . . . shareholders, representatives, employees, principals, agents, affiliates, . . . personal or legal representatives, . . . from any and all actions, . . . claims, . . . liabilities, damages, causes of action, costs, expenses, and compensation of every kind and nature whatsoever, past, present, or future, at law or in equity, whether known or unknown . . . further including without limitation any claims of fraud or fraudulent inducement in connection with the negotiation, execution and performance of this Agreement and any other documents and agreements to which [Mr. Menna] is a party in connection with the transactions contemplated hereby.[134]

Count I alleges breach of fiduciary duty by providing "materially misleading and incomplete, coercive disclosure in connection with the 2020 Repurchase Offer."[135] Count I is a claim against Company directors "in connection with the negotiation [and] execution . . . of [the Stock Repurchase] Agreement."[136] Count I "falls within the plain language of the release," and not within its sole exception.[137] Accordingly,

---

[133] *Seven Invs.*, 32 A.3d at 396 (quoting *Corp. Prop. Assocs. 6*, 817 A.2d at 779).

[134] SRA § 7.

[135] Compl. at 23 (capitalization altered). Count I does not allege under what basis the Weidhaases owe Mr. Menna fiduciary duties, though they are Company directors. *Id.* ¶¶ 3–4, 61–70.

[136] SRA § 7.

[137] *Seven Invs.*, 32 A.3d at 396; SRA § 7 ("[T]he sole exceptions to the scope of this release are for claims arising after the date hereof directly under this Agreement.").

Count I against Mr. Weidhaas as an officer and director of the Company is barred by the Release.[138] I grant the Motion in Defendants' favor as to Count I.

<em>/s/ Morgan T. Zurn</em>

Vice Chancellor Morgan T. Zurn

---

[138] SRA § 7. In an effort to be complete, I note the Release also bars Count I against Dr. Weidhaas, and Count II against both Defendants. *Id.* (releasing "including without limitation any claims of fraud or fraudulent inducement in connection with the negotiation, execution and performance of this Agreement and any other documents and agreements to which [Mr. Menna] is a party in connection with the transactions contemplated hereby"); *Seven Invs.*, 32 A.3d at 396.