CORPORATE PROPERTY ASSOCIATES 6 and Corporate Property Associates 7, Plaintiffs/Counterclaim Defendants Below, Appellants,

v.

The HALLWOOD GROUP INCORPORATED, Defendant/Counter-claim Plaintiff Below, Appellee.

No. 219, 2002.

Supreme Court of Delaware.

Submitted: Nov. 13, 2002.
Decided: March 5, 2003.

Thomas R. Hunt, Jr., Esquire (argued), and Thomas W. Briggs, Jr., Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Appellants.

Lawrence C. Ashby, Esquire, Richard D. Heins, Esquire (argued), and Joseph C. Handlon, Esquire, of Ashby & Geddes, Wilmington, Delaware, and Charles A. Crocco, Jr., Esquire of Crocco & De Maio, P.C., Mount Kisco, New York, Of Counsel, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

BERGER, Justice.

In this appeal, we consider whether disputed language in a letter agreement constitutes a general release of all claims. The trial court found the language, "[a]fter repayment of the Note, [appellee] will have no further obligation to the [appellants]," to be plain, unequivocal and global. We disagree. Given the fact that the letter agreement addressed only the early payoff of a note, we find that the contested language does not clearly act as a release of appellee's other obligations under a different agreement. Because we find the language to be ambiguous, it must be construed against the drafter. Accordingly, we reverse.

### Factual and Procedural Background

In 1992, Corporate Property Associates 6 and Corporate Properties Associates 7 (collectively, "CPA") acquired a $1.6 million promissory note that Hallwood Group Incorporated had given to a third party. After disputes between Hallwood and CPA over the amount owed under the note, the parties entered into a Settlement Agreement on January 21, 1994. Under the Settlement Agreement, the original note was replaced by a "New Note" in the amount of $500,000. The New Note provided for quarterly interest payments at the rate of 8% per year and was to mature on March 8, 1998, unless prepaid. As security for the New Note, Hallwood executed a Pledge and Security Agreement under which Hallwood pledged 446,345 units of Hallwood Realty Partners, L.P. (the "HRP units"). In the Settlement Agreement, Hallwood also agreed to pay CPA 25% of any increase in the value of the HRP units during a specified period, up to $500,000 (the "HRP contingency").

In July 1996, Hallwood decided to approach CPA about the possibility of prepaying the New Note. Joseph Koenig, Hallwood's Controller and Treasurer, wrote to Anthony Mohl, a CPA First Vice President, and proposed prepaying the $500,000 principal amount plus accrued interest in the amount of $10,082.19 on or before August 31, 1996. The two page letter identified the process by which the note would be paid and the collateral returned:

I propose the following process to simplify the payment of the note and return of the associated collateral:

1) You should fax instructions to me where the payoff amount should be wire transferred prior to the payoff date.

2) A representative from Hallwood will visit your office to determine that you are holding the original Note and the original limited partner unit certificates . . . .

3) Upon acknowledgment from our representative, we will authorize the wire transfer of the funds to the designated account . . . .

4) Upon receipt of confirmation from your bank that the funds have been received, you will mark the Note "paid-in-full," sign and date the Note accordingly. The canceled Note and the Hall-

wood Realty Partners, L.P. certificates will be given to our representative at that time, who will arrange delivery back to our Dallas office.

5) After repayment of the Note, Hallwood will have no further obligation to the Payees.

From Hallwood's perspective, the proposed prepayment represented a 50% discount on its obligations, since the HRP contingency was then worth the maximum of $500,000. Thus, if prepayment of the New Note would not only satisfy the New Note, but also extinguish the HRP contingency, Hallwood would be satisfying $1 million in obligations for $510,082.19.

Mohl did not respond to the letter, so Koenig called him in mid-August. Koenig testified that he was surprised when, instead of making a counter-offer, Mohl simply agreed to the proposal. At that point, however, there had never been any discussion about the HRP contingency, and Mohl testified by deposition that he did not understand the prepayment proposal to have any effect on it. Mohl testified that he consulted with CPA's attorneys before signing the letter agreement, but it was not until after the signed agreement was faxed to Hallwood that there was any discussion between the parties as to the scope of the release. After CPA's attorney learned that Hallwood intended the release language in the letter agreement to constitute a general release, CPA refused to go forward with the prepayment.

CPA filed this action in April 1997, alleging several grounds on which the letter agreement should be held invalid. Hallwood counterclaimed seeking enforcement of the letter agreement. After trial, the Court of Chancery found in favor of Hallwood on all claims and counterclaims. In this appeal, CPA only challenges the trial court's construction of the release language in the letter agreement.

### Discussion

■ Under settled Delaware law, "a general release ... [is] one which is intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind....Such general releases are in common use .... Their validity is unchallenged."[1] Thus, a mutual "release and discharge [of the parties], their Heirs, Executors, Administrators and Assigns from any further claim or demand whatsoever pertaining to the above recited agreement..." acts as a general release of "all matters touching the ... contract."[2] "In construing a release, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document."[3] If the language of the release is clear, it will be given effect. If it is ambiguous, however, "it must be construed most strongly against the party who drafted it."[4]

With these principles in mind, we turn to the contested language and the document in which it is found. The letter agreement specifically identifies its purpose. Before the salutation, it says, "Re: Payoff of $500,000 Promissory Note," and the first paragraph begins, "I have been referred to you by Mr. Robert Kehoe of your firm regarding the early payoff of a $500,000 note payable...." The second paragraph proposes the terms of the early

1. *Hob Tea Room v. Miller,* 89 A.2d 851, 856 (Del.1952).

2. *Id.* at 854, 856.

3. *Adams v. Jankouskas,* 452 A.2d 148, 156 (Del.1982).

4. *Ibid.*

payoff, and the third paragraph, quoted above, proposes a "process to simplify the payment... and return of ... collateral...." The disputed release language is the last item in the "simplified process," and it states, "[a]fter repayment of the Note, Hallwood will have no further obligation to the Payees."

Considering the letter agreement as a whole, we conclude that the release language is ambiguous. The letter agreement addresses only the prepayment of a note. Nowhere in this short document is there any mention of the HRP contingency, its value, or its cancellation. Thus, it is entirely reasonable for CPA to have understood the release language to refer to the note, and nothing more. Another reasonable interpretation would be that the release is a general release, extinguishing the HRP contingency as well as the note. There being two reasonable interpretations, the language must be construed to give effect to the intent of the parties. But the parties had different understandings as to the scope of the release. Thus, we are left with the rule that the disputed release language should be construed against the drafter—Hallwood.

In reaching this conclusion, we are not unmindful of the trial court's decision to reject Mohl's testimony, and, as a result, to conclude that CPA knew it had agreed to a general release. This Court can evaluate the Mohl transcript "with the same facility as the trial court..."[5] Accordingly, we need not defer to its factual findings.

The trial court faulted Mohl for failing to appear in person and also found Mohl's testimony implausible. On the first point, we note that Mohl's deposition was admitted into evidence without objection. While the trial court may have preferred to evaluate Mohl's demeanor on the witness stand, it was not free to reject undisputed evidence simply because of the format in which it was presented. On the second point, the trial court found Mohl's testimony implausible because the release language, in its view, was clear and unequivocal. The court noted that Mohl is a sophisticated, highly trained executive and that CPA's attorneys reviewed the letter agreement before it was executed. Thus, it reasoned, even if Mohl misunderstood the scope of the release, surely CPA's attorneys must have known that it was a general release and must have told Mohl.

The trial court acknowledged, however, that it made no sense for CPA to release its $500,000 HRP contingency in order to receive early payment on a collateralized note. To the trial court, the only sensible explanation was that Mohl knew the letter agreement operated as a general release, but after it was executed, some higher level CPA executive decided that Mohl had made a mistake in signing it. In other words, the trial court concluded that Mohl was not credible because the only way that the court could make sense of CPA's conduct was by concluding that Mohl lied in his deposition.

Another way to make sense of CPA's conduct would be to accept Mohl's deposition testimony and conclude that CPA understood the letter agreement to operate as a release of the New Note and not as a general release. The trial court was unwilling to do that because it assumed that CPA's attorneys must have understood the breadth of the release. Since we find the release language to be ambiguous, however, we cannot accept the trial court's assumption as to the legal advice CPA must have received. Without that assumption, what remains is Mohl's undisputed deposition testimony that he understood the re-

5. *Hob Tea Room v. Miller,* 89 A.2d at 855.

lease to be limited to the New Note. Thus, we return to our conclusion that the parties had different understandings as to the scope of the release.

## Conclusion

Based on the foregoing, the judgment of the Court of Chancery is reversed and this matter is remanded for further action in accordance with this opinion. Jurisdiction is not retained.