# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EMERGING EUROPE GROWTH FUND, L.P., and HORIZON CAPITAL GP LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 7936-VCMR |
| IHOR FIGLUS, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| IHOR FIGLUS, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2017-0373-TMR |
| NATALIE A. JARESKO, and HORIZON CAPITAL GP LLC, a Delaware limited liability company, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| EMERGING EUROPE GROWTH FUND, L.P., | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 11, 2018
Date Decided: December 10, 2018

John G. Harris and Sean A. Meluney, BERGER HARRIS LLP, Wilmington, Delaware; *Attorneys for Plaintiff.*

Richard P. Rollo and Kevin M. Gallagher, RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; *Attorneys for Defendants and Nominal Defendant.*

**MONTGOMERY-REEVES, Vice Chancellor.**

Pending before me are cross-motions to enforce a settlement agreement. These parties are no strangers to litigation. The two lead actors, an ex-husband and wife, began their first legal battle with a divorce in 2011. Second, in 2012, the limited partnership in which both are members sued the ex-husband for leaking its confidential information. Third, in 2017, the ex-husband sued his ex-wife and the limited partnership for breach of contract and breach of fiduciary duties. The parties appear to have come to their senses and decided to settle, and they reached a settlement agreement on December 11, 2017.

The parties are now before me on cross-motions to enforce the settlement agreement. There are very few factual disputes; the parties generally agree about the applicable legal standards; and the parties seek specific performance. They dispute the scope of the "mutual general release" that they agreed to as part of the December 11, 2017 settlement. In particular, I must decide whether the parties intended to release their Ukrainian divorce proceedings, including an ongoing case the ex-wife filed regarding unpaid alimony.

In this opinion, I hold that the parties did not intend to release the Ukrainian divorce proceedings, and I grant the ex-husband's motion and deny the ex-wife's motion.

## I.  BACKGROUND

The parties agree that on December 11, 2017, they reached an enforceable settlement agreement (the "Settlement Agreement") resolving two pending cases between the parties in Delaware.[1]  They dispute the meaning of the Settlement Agreement, and the parties move to enforce the version they argue the parties agreed to.

### A.  Parties

Ihor Figlus and his ex-wife Natalie Jaresko, who divorced in 2011, are limited partners in Emerging Europe Growth Fund, L.P. ("Emerging"), a Delaware limited liability partnership.[2]  Horizon Capital GP LLC ("Horizon Capital") is Emerging's general partner.[3]  I will refer to Jaresko, Emerging, and Horizon Capital collectively as the "Horizon Parties."

### B.  Facts

On October 10, 2012, Horizon Capital and Emerging filed a lawsuit (C.A. No. 7936-VCMR)  (the "First Delaware Action") against Figlus, asking this Court to enjoin Figlus from disclosing nonpublic information about Emerging to the press in

---

[1]     Horizon Parties' Mot. 2; Figlus's Mot. 4.

[2]     Verified Complaint, *Figlus v. Jaresko*, C.A. No. 2017-0373-TMR (Del. Ch. May 15, 2017) 3-4 [hereinafter Figlus Compl.].

[3]     *Id.* at 2.

Ukraine, in violation of Emerging's partnership agreement.[4]  This Court entered a temporary restraining order[5] and later a preliminary injunction[6] against Figlus.

On May 15, 2017, Figlus filed this lawsuit (C.A. No. 2017-0373-TMR) (the "Second Delaware Action") against Horizon Capital and Jaresko for breach of fiduciary duty and breach of contract.[7]  Thereafter, the parties began settlement discussions, and by December they were close to an agreement.

On December 6, 2017, Figlus's counsel made the following offer to the Horizon Parties:

> [W]e are authorized to counter your client's pending offer with the following terms: (i) a total cash settlement payment of $249,000, to be delivered in one-lump [*sic*] sum upon full execution and delivery of the settlement agreement; (ii) the purchase of Mr. Figlus's partnership interest; and (ii) [*sic*] a mutual, general release, which would include, without limitation, any claims/defenses that relate to or otherwise arise out of the loans, notes, or

---

[4]     Verified Complaint, *Emerging Europe Growth Fund, L.P. v. Figlus*, C.A. No. 7936-VCMR (Del. Ch. Oct. 10, 2012).

[5]     Ruling on Motion to Expedite Proceedings and Motion for Temporary Restraining Order, *Emerging Europe Growth Fund, L.P. v. Figlus*, C.A. No. 7936-VCMR (Del. Ch. Oct. 16, 2012).

[6]     Order on Plaintiffs' Motion for Preliminary Injunction, *Emerging Europe Growth Fund, L.P. v. Figlus*, C.A. No. 7936-VCMR (Del. Ch. Dec. 27, 2012).

[7]     Figlus Compl., *supra* note 2.

security agreements between [Emerging]/the Horizon entities and Ms. Jaresko and Mr. Figlus.[8]

On December 7, the Horizon Parties' counsel sent Figlus's counsel an email saying, "Thank you for the call earlier today. As discussed, the client is willing to pay $175k in exchange for (i) Mr. Figlus's partnership interests and (ii) mutual general releases."[9] On December 8, Figlus's counsel responded, "Mr. Figlus is willing to settle this matter for $205,000, along with the terms set forth in Jack's email below, which is dated December 6th."[10] On December 11, counsel for the Horizon Parties and counsel for Figlus spoke by phone and discussed the terms of the settlement. No counsel submitted an affidavit or any other admissible evidence regarding the December 11 phone call. Thus, there is no contemporaneous evidence before me that reflects the contents of that phone call.

On December 11, after the phone call, the Horizon Parties' counsel sent Figlus's counsel an email saying, "I have confirmed that $195k is acceptable, and will send a more formal acceptance once I am in front of a computer."[11] The parties agree that they reached an enforceable settlement agreement on December 11; the

---

[8]     Horizon Parties' Mot. Ex. 1, at 2.

[9]     *Id.* at 1.

[10]    *Id.*

[11]    Horizon Parties' Mot. Ex. 2, at 1.

4

terms included (1) payment of $195,000 to Figlus, (2) purchase of Figlus's limited partnership interests, and (3) mutual general releases.[12]

On December 21, 2017, the Horizon Parties sent Figlus a draft settlement agreement (the "December 21 Draft") reflecting what the Horizon Parties considered to be the agreed-upon terms.[13]  The December 21 Draft purports to release claims "that arise out of, relate to, or are connected in any manner, directly or indirectly, with the Delaware Actions, this Settlement Agreement or the underlying events, actions, negotiations and other information arising out of, relating to, or connected in any manner, directly or indirectly, thereto."[14]  The December 21 Draft defines the Delaware Actions as "*Emerging Europe Growth Fund, L.P. et al. v. Ihor Figlus*, C.A. No. 7936-VCMR (Del. Ch.) and *Ihor Figlus v. Natalie Jaresko et al.*, C.A. No. 2017-0373-TMR (Del. Ch.)."[15]

On December 26, Figlus's counsel responded with a revised draft settlement agreement, which included changes he characterized as "fairly minor."  Figlus's counsel added the following language to the end of Section 3(b) of the December 21

---

[12]     Horizon Parties' Mot. 5 (citing Exs. 2-3), 15-17; Figlus's Mot. 6, 15.

[13]     Horizon Parties' Mot. Ex. 4.

[14]     *Id.* at 4.

[15]     *Id.* at 3.

5

Draft: "This release shall not apply to any liabilities, debts, alimony, property distributions, and/or other liabilities pursuant to, or arising out of, a past or future divorce decree."[16] The Horizon Parties objected on December 27, saying that Figlus's proposed carve out was not contemplated in the December 11 Settlement Agreement.[17] The parties then exchanged emails about who had agreed to what and when, the scope of the release, and the inclusion of the carve out.[18] Because of the dispute over terms, the parties never executed the same version of the settlement agreement.

On October 11, 2018, Figlus filed a letter with this Court stating that on July 12, 2018, Jaresko filed an individual civil complaint in Ukraine (the "Ukrainian Complaint") to collect alimony for the maintenance of minor children based on a previous Ukrainian court judgment (all divorce actions in Ukraine collectively, the "Ukrainian Divorce Proceedings").[19] Figlus argues that the Ukrainian Complaint

---

[16] Horizon Parties' Mot. Ex. 5, at 3.

[17] *Id.* Ex. 6, at 1.

[18] *Id.* Ex. 8.

[19] Letter from John G. Harris, Esquire to the Honorable Tamika Montgomery-Reeves Dated October 11, 2018 Regarding the Parties' Pending Cross-Motions to Enforce Settlement (the "Harris Letter") 1, D.I. 100. The docket reflects no response from the Horizon Parties regarding, or objecting to, my consideration of the letter or the attached papers from the Ukrainian Divorce Proceedings.

represents "probative, admissible evidence showing that Jaresko did not intend for the settlement agreement at issue here, which was negotiated and drafted last December, to release domestic-related claims like the one asserted" in Ukraine.[20]

The Ukrainian Complaint states that the claim is based on an action that was initiated on December 4, 2012, when Jaresko filed papers attempting to recover alimony for the maintenance of minor children from Figlus.[21]  On June 30, 2016, a Ukrainian state official terminated the action and directed the parties to pursue the case in a different manner.[22]  On May 18, 2017, the District Court of Kyiv overturned the state official's termination and required the state official to restart proceedings.[23] On September 18, 2017, the enforcement hearings to update the alimony were reinstated.[24]  On January 10, 2018, the state official again terminated the case, this time because Jaresko had not sent in the required documents.[25]  Jaresko claims in the Ukrainian Complaint that she did not receive notice of the September 18, 2017, and

---

[20]     *Id.* at 2.

[21]     Attachment to the Harris Letter ("Harris Letter Attachment") 6.

[22]     *Id.* at 7.

[23]     *Id.*

[24]     *Id.*

[25]     *Id.*

January 10, 2018 decisions.  On June 25, 2018, Jaresko submitted an application to the state official to restore the action again.[26]  In the attached July 12, 2018 filing, Jaresko requests that the Ukrainian court reinstate the case because of the notice failure.[27]

## II.    ANALYSIS

The parties do not dispute that they reached the Settlement Agreement on December 11, 2017.  They agree on all three terms of the agreement.  They agree on the need for specific performance.  They only disagree on the scope of the mutual general release.

The Horizon Parties argue that the parties agreed to a full mutual general release that covers all of the disputes between the parties, including the Ukrainian Divorce Proceedings, because the release contains no carve outs.  Figlus argues that the parties agreed to enter into a mutual general release of claims that "arise out of, relate to, or are connected in any manner, directly or indirectly, with the Delaware Actions."[28]  Figlus argues that there was no need for a carve out because the parties

---

[26]    *Id.*

[27]    *Id.* at 9.

[28]    Figlus's Reply Br. at 3 (citation omitted).

8

never intended the release to cover anything more than the Delaware Actions.[29]

Thus, I must determine the scope of the "mutual general releases."

General releases are a powerful tool under Delaware law.

> [T]he concept of a general release [is] one which is intended to cover everything—what the parties presently have in mind, as well as what they do not have in mind, but what may, nevertheless, arise. Such general releases are in common use, and their potency, if it renders them too dangerous for careless handling, is at the same time a constant boon to business and courts. Their validity is unchallenged.[30]

"[T]he scope of a general release [is not] limited to the sum of all the individual items which the parties specifically and affirmatively intended to include within it. . . . [A] release [derives] generality from a mere contract to make it general."[31] "Thus, a mutual release . . . acts as a release of 'all matters touching the . . . contract.'" [32]  "An effective release terminates the rights of the party executing and delivering the release and . . . is a bar to recovery on the claim released."[33]  "In

---

[29]    *See* Figlus's Reply Br. at 3-4.

[30]    *Hob Tea Room v. Miller*, 89 A.2d 851, 856 (Del. 1952).

[31]    *Id.* at 857.

[32]    *Corp. Prop. Assocs. 6 v. Hallwood Gp. Inc.*, 817 A.2d 777, 779 (Del. 2003) (omissions in original) (quoting *Hob Tea Room*, 89 A.2d at 856).

[33]    *Seven Invs., LLC v. AD Capital, LLC*, 32 A.3d 391, 396 (Del. Ch. 2011) (omissions in original) (quoting *Hicks v. Soroka*, 188 A.2d 133, 138 (Del. Super. 1963)).

9

construing a general release, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain the intent from the overall language of the document."[34]  "[W]here the language of the release is clear and unambiguous, it will not lightly be set aside."[35]  "Where, however, the language of the release is ambiguous, it must be construed most strongly against the party who drafted it."[36]

The operative document that reflects the settlement consists of various emails between the parties from December 6 through December 11, 2017.  The release language appears in an email dated December 6.  On December 11, 2017, the parties had a phone call about the settlement and discussed the release and a potential carve out, but I have no contemporaneous, admissible evidence of what they said.  On December 11, 2017, counsel for the Horizon Parties accepted the deal.   Thus, the only evidence before me regarding the release is the December 6 email, which offers a "mutual, general release, which would include, without limitation, any claims/defenses that relate to or otherwise arise out of the loans, notes, or security

---

[34]     *Corp. Prop. Assocs. 6*, 817 A.2d at 779 (quoting *Adams v. Jankouskas*, 452 A.2d 148, 156 (Del. 1982)).

[35]     *Adams*, 452 A.2d at 156 (citing *Hob Tea Room*, 89 A.2d at 851).

[36]     *Id.*

agreements between [Emerging]/the Horizon entities and Ms. Jaresko and Mr. Figlus."[37]

Figlus argues that this language, "any claims/defenses that relate to or otherwise arise out of the loans, notes, or security agreements between [Emerging]/the Horizon entities and Ms. Jaresko and Mr. Figlus," on its face, simply does not include the Ukrainian Divorce Proceedings.[38] Figlus adds that it was never his intent to settle the actively ongoing Ukrainian Divorce Proceedings, which addressed alimony, distribution of marital assets, and custody, in such a passive, indirect manner. Figlus's interpretation is reasonable. It seems entirely logical to assume that if the parties intended to include such a proceeding they would do so expressly.

Jaresko disagrees, however, and responds that the parties meant to release all claims between them through the operative language, "a *mutual, general release*, which would include, *without limitation*."[39] Jaresko further argues that even if the "mutual, general release" is somehow limited to "any claims/defenses that relate to or otherwise arise out of the loans, notes, or security agreements between [Emerging]/the Horizon entities and Ms. Jaresko and Mr. Figlus," the release still

---

[37] Figlus's Mot. Ex. 1, at 2.

[38] *Id.* at 8-9; Figlus's Reply Br. 4-5.

[39] Jaresko's Reply Br. 3 (emphases added); Oral Arg. Tr. 30:3-10, 36:7-9.

includes the Ukrainian Divorce Proceedings. This, Jaresko explains, is because Figlus misused the documents from the First Delaware Action to benefit himself in the Ukrainian Divorce Proceedings. Pointing to approximately forty citations to the record in the First Delaware Action, Jaresko argues that "information about those loans and agreements is what [Figlus] gave to his divorce lawyer, is what he gave to the press. And in connection with that, there were arguments about whether or not that was permissible for the divorce."[40] Thus, "[t]he divorce was an issue or a fact relating to the arguments over the loans, the security agreements, and otherwise."[41] Additionally, Jaresko suggests that "the loans" may have related to some of the marital assets that were being untangled in the Ukrainian Divorce Proceedings.[42] Although Jaresko's argument does not have the same logical appeal as Figlus's argument, it is a reasonable interpretation, especially when one considers the background underlying the First Delaware Action.

"[A] contract is ambiguous . . . when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more

---

[40] Oral Arg. Tr. 7:20-24; Jaresko's Reply Br. 8 n.3.

[41] Oral Arg. Tr. 8:2-4.

[42] *Id.* at 8:4-12.

different meanings."[43] If a contract is ambiguous, a "court may then look to extrinsic evidence to uphold to the extent possible, the reasonable shared expectations of the parties at the time of contracting."[44] Such extrinsic evidence may include "the history of negotiations, earlier drafts of the contract, trade custom, or course of performance."[45] "After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of the negotiation."[46]

The December 11, 2017 Settlement Agreement is short and does not include definitions. Both parties present reasonable interpretations. Therefore, I hold that the Settlement Agreement is ambiguous because it is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Because of that, I turn to extrinsic evidence to clarify the meaning of the terms. The extrinsic evidence before me, Jaresko's draft merger agreement and Jaresko's

---

[43] *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).

[44] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003).

[45] *In re Westech Capital Corp.*, 2014 WL 2211612, at *9 (Del. Ch. May 29, 2014).

[46] *Salamone v. Gorman*, 106 A.3d 354, 374-75 (Del. 2014) (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) (alteration in original)).

13

behavior in Ukraine, suggests that the parties did not intend to include the Ukrainian Divorce Proceedings.

First, Jaresko's December 21, 2017 draft supports my conclusion. Unlike the December 11, 2017 Settlement Agreement, which is very short, the December 21 Draft defines what the release covers extensively: the release covers actions that "arise out of, relate to, or are connected in any manner, directly or indirectly, with the Delaware Actions, this Settlement Agreement or the underlying events."[47] The December 21 Draft defines "Delaware Actions" based on their Delaware civil action numbers.[48] It defines the "Settlement Agreement" as itself.[49] The release section is expansive, spending over 240 words defining "claim." It does not mention anything about Ukraine or a divorce proceeding, despite the fact that the Ukrainian Divorce Proceedings had been ongoing for approximately six years and Jaresko had pending motions in Ukraine. I am not convinced that Jaresko intended to end the active Ukrainian litigation with a vague reference to actions that "arise out of" or "relate to" the Delaware Actions.

Additionally, Jaresko's behavior in Ukraine before, during, and after the negotiations also is consistent with an understanding that the Ukrainian Divorce

---

[47]     Figlus's Mot. Ex. 4, at 4.

[48]     *Id.* Ex. 4, at 3.

[49]     *Id.*

14

Proceedings were not included in the release. Jaresko filed papers in the Ukrainian Divorce Proceeding in May 2017. I do not find it credible that Jaresko did not have her ongoing divorce matter, in which she was actively attempting to require her ex-husband to pay alimony, in mind when she approved the agreement that her lawyers had negotiated on December 11, 2017, but she did not have them expressly include it in her December 21 Draft. Further, after negotiating and reaching the Settlement Agreement, she continued to file papers to pursue the Ukrainian Divorce Proceedings, seeking to reopen the case as late as July 2018. This behavior is not consistent with a belief that she had released the Ukrainian Divorce Proceedings.

Jaresko has taken a litigation position that the December 11 phone call fills in details about the Settlement Agreement that the parties never memorialized. Those details, however, are at odds with the written evidence before me and with Jaresko's behavior in Ukraine. Jaresko has presented me with no contemporaneous evidence to support her litigation position in Delaware; thus, I reject it.

In light of the extrinsic evidence, I hold that "only one meaning is objectively reasonable in the circumstances of the negotiation," and that is Figlus's interpretation. The release does not reach the Ukrainian Divorce Proceedings.

## III. CONCLUSION

Because I find that the parties' mutual general release did not reach the ongoing Ukrainian Divorce Proceedings, I hold that Figlus's December 26, 2017

draft language best reflects the intent of the parties. Therefore, I GRANT Figlus's motion to enforce the settlement agreement, and I DENY the Horizon Parties' motion to enforce the settlement agreement.

**IT IS SO ORDERED**.