# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ARMAMENTS RESEARCH COMPANY, INC., <br><br>        Plaintiff, <br><br>     v. <br><br> WILLIAM O'NEIL <br> (FKA WILLIAM DENG), <br><br>        Defendant. | C.A. No. 2025-0944-LWW |

## MEMORANDUM OPINION

Date Submitted: December 9, 2025
Date Decided:  March 17, 2026

Robert K. Beste, K&L GATES LLP, Wilmington, Delaware; *Attorney for Plaintiff Armaments Research Company, Inc.*

Dominick T. Gattuso & Elizabeth A. DeFelice, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Nathaniel J. Pencook, NELSON MULLINS RILEY & SCARBOROUGH LLP, Raleigh, North Carolina; *Attorneys for Defendant William O'Neil*

**WILL, Vice Chancellor**

In 2021, Armaments Research Company, Inc. and its co-founder William O'Neil signed a Separation Agreement establishing a process to value and repurchase O'Neil's equity. They later signed a Stock Repurchase Agreement to effect that transfer. Three years later, the parties disputed a contractual price adjustment.

O'Neil sued in North Carolina under the Separation Agreement. Armaments sued here, seeking an anti-suit injunction based on a Delaware forum selection clause in the Stock Repurchase Agreement. O'Neil now moves to dismiss Armaments' lawsuit.

Armaments' action rests on the flawed premise that the Stock Repurchase Agreement extinguished the Separation Agreement. Because O'Neil's claims arise under the Separation Agreement, he did not breach the forum selection clause by suing in North Carolina. Armaments' claim for breach of the Stock Repurchase Agreement is dismissed with prejudice.

As for the remaining declaratory judgment claim, I decline to exercise jurisdiction. The claim can be fully resolved in the pending North Carolina action and is overripe. It is therefore dismissed without prejudice.

## I. BACKGROUND

Unless otherwise noted, the following facts are drawn from the Verified Amended and Supplemental Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A. The Separation Agreement

Armaments Research Company, Inc. is a Delaware corporation with its principal place of business in Bethesda, Maryland.[2] It is a technology company developing hardware and software for artificial intelligence-enabled weapons sensors that support large-scale combat operations.[3] William O'Neil, formerly known as William Deng, is a co-founder of Armaments who resides in North Carolina.[4]

On June 15, 2021, Armaments and O'Neil entered into a Separation Agreement to sever their relationship.[5] According to Armaments, its technology

---

[1] Verified Am. and Suppl. Compl. Seeking Anti-Suit Inj. and Other Relief (Dkt. 13) ("Am. Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . ."). The paragraphs in the Complaint are misnumbered; citations to the Complaint reflect the paragraph numbers included in the document.

[2] Am. Compl. ¶ 1.

[3] *Id.* ¶ 2.

[4] *Id.* ¶¶ 3-4.

[5] *Id.* ¶ 9.

development was beginning to outpace O'Neil's skillset.[6]   The Separation Agreement is governed by North Carolina law.[7]

Under the Separation Agreement, the parties agreed to a process for Armaments to repurchase O'Neil's shares.[8]   Moss Adams LLP, an independent valuation firm, would calculate the share value.[9]   The parties would then mutually agree to one of two repurchase options within ten days after the price was determined.[10]

The first option called for Armaments to repurchase the equivalent of 3,900,000 shares of O'Neil's common stock in exchange for a promissory note.[11] The note would be due at the earlier of five years after the separation date, June 15, 2026, or the closing of a bona fide acquisition of Armaments.[12]   If the note remained

---

[6] *Id.* ¶ 9.

[7] *Id.* at Ex. 2 ("Separation Agreement") § 18.

[8] *Id.* § 6.

[9] *Id.* § 6(b); *see also* Am. Compl. ¶ 14.

[10] Separation Agreement § 6(a).

[11] *Id.* § 6(a), (c).

[12] *Id.* § 6(c); *see also* Am. Compl. ¶ 15.

unpaid by June 15, 2024, the parties agreed to adjust the purchase price by applying a new per-share value determined by a second Moss Adams valuation.[13]

The Separation Agreement contemplated that the parties would enter into a later, binding agreement relating to Armaments' acquisition of O'Neil's stock once the price was determined.[14]

### B. The Stock Repurchase Agreement

On August 10, 2021, the parties amended the Separation Agreement to extend the initial valuation date to August 24, 2021.[15] On August 25, Moss Adams presented its valuation to Armaments. It concluded that the fair market value of one share of Armaments common stock (on a minority, non-marketable basis) was $0.154.[16]

On September 28, the parties executed a Stock Repurchase and Transaction Bonus Cancellation Agreement (the "Stock Repurchase Agreement"), which is governed by Delaware law.[17] To satisfy the aggregate purchase price of $354,199.85, Armaments delivered to O'Neil a promissory note (the "Note").[18] In connection

---

[13] Separation Agreement § 6(d).

[14] *Id.* § 6(a).

[15] Am. Compl. Ex. 3 (Amendment to Separation Agreement) § 1; *see also* Am. Compl. ¶ 17.

[16] Am. Compl. ¶ 19.

[17] *Id.* at Ex. 1 ("Stock Repurchase Agreement") § 11; Am. Compl. § 20.

[18] Am. Compl. Ex. 4 ("Note"); Stock Repurchase Agreement § 1; *see also* Am. Compl. ¶ 21.

4

with the Stock Repurchase Agreement, O'Neil executed a stock assignment transferring 2,299,999 of his shares of common stock to Armaments.[19]

The Stock Repurchase Agreement contains a "Release and Waiver" provision in which O'Neil released Armaments from all claims "arising directly or indirectly out of" an "investment in, ownership of, and the sale of" his shares.[20] The parties also agreed that any action "brought by either party under or in relation to" the Stock Repurchase Agreement would be submitted to the exclusive jurisdiction and venue of Delaware courts.[21]

### C. The Second Valuation

As of June 15, 2024, Armaments had not repaid the Note.[22] On June 17, it proposed that the parties forgo the 2024 valuation required by the Note, but O'Neil refused.[23] As a result, under Section 3 of the Note, Moss Adams began a new

---

[19] Stock Repurchase Agreement Ex. B.

[20] Stock Repurchase Agreement § 7(a) ("[T]he Seller . . . irrevocably and unconditionally forever discharges, acquits and releases the Company . . . from all rights, claims . . . arising directly or indirectly out of [] an investment in, ownership of, and the sale of the Shares . . . .").

[21] *Id.* § 11.

[22] Am. Compl. ¶ 21.

[23] *Id.* ¶ 22.

valuation "in a manner substantively consistent with the valuation process set forth in Section 6(b) of the Separation Agreement."[24]

On July 19, 2024, Moss Adams completed the second valuation, calculating a new per-share fair market value of $0.08.[25]  O'Neil disputed this valuation, arguing that the methodology did not represent fair market value.[26]  Moss Adams provided further explanations, but O'Neil was not swayed.[27]

O'Neil insisted the shares be valued based on the company's enterprise value.[28]  He also accused Armaments of pursuing the valuation independently, despite a purported requirement to include him.[29]  Armaments, however, maintained that the valuation properly followed the Note and Stock Repurchase Agreement, which required applying a discount for lack of control and lack of marketability.[30]

---

[24] *Id.* ¶ 23; *see also* Note § 3.

[25] Am. Compl. ¶ 24.

[26] *Id.* ¶ 26.

[27] *Id.* ¶¶ 27-32.

[28] *Id.* ¶ 33.

[29] *Id.* at Ex. 5 ("North Carolina Compl.") ¶¶ 27-29.

[30] Am. Compl. ¶¶ 33-34.

Armaments also expressed a willingness to commission another valuation to address O'Neil's objections.[31]

### D. The Lawsuits

On June 26, 2025, O'Neil sent a "notice of rescission" of the Separation Agreement.[32] He demanded that Armaments retitle the repurchased shares in his name based on purported rights under the Separation Agreement.[33] Armaments rejected the notice.[34]

A month later, on July 25, Armaments sent O'Neil a check for $391,211.24 to satisfy its obligations under the Note and the Stock Repurchase Agreement.[35] The amount was based on the July 2024 valuation.[36] O'Neil did not cash or deposit the check.[37]

On August 21, Armaments filed a complaint in this court against O'Neil.[38] Four days later, on August 25, O'Neil—unaware of the Delaware suit—filed an action against Armaments in the Superior Court of North Carolina (the "North

---

[31] *Id.* ¶ 36.

[32] *Id.* at Ex. 6 (notice of rescission); Am. Compl. ¶ 37.

[33] Am. Compl. Ex. 6 at 2; Am. Compl. ¶ 37.

[34] Am. Compl. ¶ 38.

[35] *Id.* ¶ 39.

[36] *Id.* ¶ 40.

[37] *Id.* ¶ 42.

[38] Verified Compl. for Declaratory J. (Dkt. 1).

Carolina Action").[39] He claims that Armaments breached the Separation Agreement, the Note, and the implied covenant of good faith and fair dealing, and seeks a declaratory judgment regarding his ownership of Armaments common stock.[40] On November 3, Armaments moved to dismiss the North Carolina Action.[41]

Litigation activity then accelerated in Delaware. On November 4, Armaments filed the operative amended Complaint.[42] It seeks a declaratory judgment regarding the invalidity of the notice of rescission and confirming the results of the 2024 valuation (Count I) and an anti-suit injunction against the North Carolina Action for breach of the Stock Repurchase Agreement's forum selection clause (Count II).[43] The Complaint was accompanied by a motion for a preliminary anti-suit injunction.[44]

The parties subsequently agreed to a consolidated briefing schedule. On November 21, O'Neil filed an opening brief in support of a motion to dismiss the

---

[39] *See generally* North Carolina Compl.

[40] *Id.* ¶¶ 41-78.

[41] Am. Compl. ¶ 47; *see also id.* at Ex. 7 ("North Carolina Mot. to Dismiss").

[42] Dkt. 13.

[43] Am. Compl. ¶¶ 46-57.

[44] Pl.'s Opening Br. in Supp. of Mot. for Prelim. Anti-Suit Inj. (Dkt. 15) ("Pl.'s Inj. Mot.").

Complaint.[45]  Briefing on the cross-motions was complete on December 7.[46]  Oral argument was held on December 9, and the motions were taken under advisement.[47]

## II.  ANALYSIS

O'Neil moves to dismiss the Complaint on several grounds.  First, he contends under Court of Chancery Rule 12(b)(2) that this court lacks personal jurisdiction over him.[48]  Second, he argues under Rule 12(b)(6) that Count II fails to state a claim because he did not breach the Stock Repurchase Agreement by filing the North Carolina Action.[49]  Third, he asserts that the underlying valuation dispute arises under the Separation Agreement rather than the Stock Repurchase Agreement, and seeks dismissal of Count I under Rule 12(b)(3) on *forum non conveniens* grounds.[50]  Finally, he urges the court to decline jurisdiction over Count I as a matter of

---

[45] *See* Def.'s Opening Br. in Supp. of Mot. to Dismiss. (Dkt. 24) ("Def.'s Opening Br.").

[46] *See* Pl.'s Reply Br. in Supp. of its Mot. for a Prelim. Inj. and Answering Br. Opposing Def.'s Mot. to Dismiss (Dkt. 28) ("Pl.'s Opp'n Br."); *see also* Def.'s Reply Br. in Supp. of Mot. to Dismiss (Dkt. 31) ("Def.'s Reply Br.").

[47] *See* Judicial Action Form (Dkt. 37).

[48] Def.'s Opening Br. 26-28; Def.'s Reply Br. 18-29.

[49] Def.'s Opening Br. 14-25; Def.'s Reply Br. 2-18.

[50] Def.'s Opening Br. 32-40; Def.'s Reply Br. 31.

discretion because the controversy is "overripe" and the North Carolina Action will resolve the complete dispute.[51]

O'Neil's arguments succeed, save one. Although I conclude that the court has personal jurisdiction over O'Neil, neither of Armaments' claims can go forward. Count II is dismissed because the North Carolina Action does not breach the Stock Repurchase Agreement's forum selection clause. The remaining declaratory judgment claim in Count I arises under the Separation Agreement and is more appropriately heard in North Carolina.

## A. Personal Jurisdiction

O'Neil moves for dismissal for lack of personal jurisdiction.[52] On a motion to dismiss under Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[53] It must "demonstrate the two bedrock requirements for personal jurisdiction: (1) a statutory basis for service of process; and (2) the requisite 'minimum contacts' with the forum to satisfy constitutional due process."[54] The court is not confined to the pleadings and may consider affidavits or other documentary evidence.[55] The plaintiff "need only make

---

[51] Def.'s Opening Br. 40-44; Def.'s Reply Br. 31.

[52] Def.'s Opening Br. 28.

[53] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[54] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *6 (Del. Ch. May 7, 2008).

[55] *See Sample v. Morgan*, 935 A.2d 1046, 1055-56 (Del. Ch. 2007) (explaining that under Rule 12(b)(2), the court is "permitted to rely upon the pleadings, proxy statement,

10

a *prima facie* showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[56]

O'Neil expressly consented to personal jurisdiction in Delaware.[57] He executed the Stock Repurchase Agreement on September 28, 2021.[58] Section 11 of the Stock Repurchase Agreement contains a mandatory forum selection clause:

> The parties agree that any action brought by either party under or in relation to this Agreement . . . shall be brought in, and each party agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court located in Delaware.[59]

A valid forum selection clause is a form of express consent to personal jurisdiction.[60] "Where the parties to the forum selection clause have consented freely and knowingly to the court's exercise of jurisdiction, the clause is sufficient to confer personal jurisdiction on a court."[61] Due process is also satisfied where a party

---

affidavits, and briefs of the parties in order to determine whether the defendants are subject to personal jurisdiction" (citation omitted)).

[56] *Ryan*, 935 A.2d at 265 (citation omitted).

[57] Pl.'s Opp'n Br. 24.

[58] Am. Compl. ¶ 20.

[59] Stock Repurchase Agreement § 11.

[60] *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013).

[61] *Id.*

consents to jurisdiction through a forum selection clause, as the party has affirmatively waived any objection to the forum.[62]

O'Neil insists that the forum selection clause is inapplicable because the underlying dispute concerns the valuation process in the Separation Agreement, not the Stock Repurchase Agreement.[63] This argument conflates the merits of the breach of contract claim with the court's authority to determine the scope of the agreement. A court has "jurisdiction to determine its own jurisdiction."[64] When a contract contains a broad forum selection clause covering disputes "in relation to" the agreement, the court has the power to determine the threshold question of whether a dispute falls within that scope.[65]

Armaments' claims also implicate the "Release and Waiver" in Section 7(a) of the Stock Repurchase Agreement.[66] Armaments alleges that this provision extinguished the Separation Agreement, mandating that the parties litigate under the Stock Repurchase Agreement in Delaware.[67] Whether Armaments is correct on the

---

[62] *See Sternberg v. O'Neil*, 550 A.2d 1105, 1111 (Del. 1988) ("[A] state still has power to exercise general judicial jurisdiction over a foreign corporation which has expressly consented to the exercise of such jurisdiction.").

[63] Def.'s Opening Br. 26.

[64] *United States v. Ruiz*, 536 U.S. 622, 628 (2002).

[65] *See Ashall Homes Ltd. v. ROK Ent. Gp. Inc*., 992 A.2d 1239, 1252-53 (Del. Ch. 2010).

[66] Stock Repurchase Agreement § 7(a).

[67] Pl.'s Opp'n Br. 4-11.

merits is a question of contract interpretation that "relat[es] to" the Stock Repurchase Agreement.[68]  Because O'Neil consented to litigate disputes "in relation to" the Stock Repurchase Agreement in Delaware,[69] he is subject to this court's jurisdiction for the purpose of interpreting that contract's scope and applicability.

## B.  Breach of Contract

In Count II of the Complaint, Armaments claims that O'Neil breached the forum selection provision of the Stock Repurchase Agreement by filing the North Carolina Action.[70]  It seeks a permanent anti-suit injunction of the North Carolina Action and attorneys' fees as ultimate relief, and a preliminary anti-suit injunction for now.[71]  O'Neil moves to dismiss this claim under Rule 12(b)(6), arguing that because the Stock Repurchase Agreement does not govern the underlying dispute, its forum selection clause is inapplicable.[72]

"The standards governing a motion to dismiss for failure to state a claim are well settled."[73]  The court must accept:

> all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw

---

[68] Stock Repurchase Agreement § 11.

[69] *Id.*

[70] Am. Compl. ¶¶ 51-57.

[71] *Id.* ¶¶ 56-58; *see* Pl.'s Inj. Mot. 1.

[72] Def.'s Opening Br. 14-25; Def.'s Reply Br. 2-18.

[73] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002).

all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[74]

The court is not "required to accept every strained interpretation of the allegations proposed by the plaintiff."[75] When interpreting a contract on a motion to dismiss, "[d]ismissal is proper only if the defendants' interpretation is the only reasonable construction as a matter of law."[76]

### 1. Scope of the Stock Repurchase Agreement

To state a claim for breach of the Stock Repurchase Agreement, Armaments must demonstrate that O'Neil's claims in North Carolina fall within the scope of the forum selection clause.[77] It attempts to do so by pointing to the agreement's release provision. Section 7(a) of the Stock Repurchase Agreement releases claims "arising directly or indirectly out of (x) an investment in, ownership of, and the sale of the Shares or (y) the Transaction Bonus Agreement . . . ."[78] In Armaments' view, this

---

[74] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[75] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[76] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

[77] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) ("In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff.").

[78] Stock Repurchase Agreement § 7(a).

language bars O'Neil from suing under the Separation Agreement to challenge the valuation or demand a return of shares because it subsumed all stock-related rights under the Stock Repurchase Agreement.[79]

I reject this interpretation as a matter of law. "In construing a release, the intent of the parties as to its scope and effect are controlling, and the court will attempt to ascertain their intent from the overall language of the document."[80] "If the language of the release is clear, it will be given effect."[81] Although the release in Section 7(a) covers claims related to the sale of the shares in 2021, it lacks language releasing future performance obligations. A general release is "intended to cover . . . what the parties presently have in mind, as well as what they do not have in mind."[82] But it will "not be construed to bar a claim which had not accrued at the date of [the release's] execution."[83]

The dispute here concerns the 2024 valuation process—a future obligation triggered three years after the Stock Repurchase Agreement was signed. O'Neil asserts that Armaments failed to follow the specific valuation procedures mandated

[79] Pl.'s Opp'n Br. 11.

[80] *Adams v. Jankouskas*, 452 A.2d 148, 156 (Del. 1982).

[81] *Corp. Prop. Assocs. 6 v. Hallwood Gp. Inc.*, 817 A.2d 777, 779 (Del. 2003).

[82] *Id.* (citation omitted).

[83] *Pineda v. Steinberg*, 2008 WL 4817088, at *2 n.5 (Del. Super. Oct. 29, 2008) (quoting *Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 58 (3d Cir. 2001)); *cf. UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 348 (Del. Ch. 2006).

by Section 6(b) of the Separation Agreement.[84]  The release in Section 7(a) of the Stock Repurchase Agreement cannot reasonably be interpreted to immunize Armaments from complying with these future procedural obligations.  Nor does it explicitly waive the specific remedy for breach in Section 17 of the Separation Agreement regarding the return of unpaid shares.[85]

Armaments' position is also internally inconsistent.  It seeks to enforce the price adjustment mechanism in the Note.[86]  The Note, however, defines the "New Per Share Fair Market Value" by reference to the Separation Agreement.[87]  Armaments relies on the Note's incorporation of the Separation Agreement's valuation metrics.  It cannot simultaneously argue that the Stock Repurchase Agreement's release extinguished all stock-related claims under the Separation Agreement.

---

[84] Def.'s Opening Br. 15, 23; Def.'s Reply Br. 12.

[85] Separation Agreement § 17 ("If the Company breaches, any shares unpaid will be returned to you.  If you breach this Agreement, any unpaid shares will be returned to the Company.").

[86] Pl.'s Opp'n Br. 8-9.

[87] Note § 3 ("'New Per Share Fair Market Value' means the fair market value of one share of the Company's Common Stock as of June 15, 2024, as determined by the Valuator (*as defined in that certain Separation Agreement*, dated as of June 15, 2021, by and between the Company and Holder . . .)" (emphasis added)).

### 2. Whether the Separation Agreement Was Superseded

Armaments next argues that the Stock Repurchase Agreement "supplanted and replaced" the Separation Agreement.[88] Under Delaware law, which applies to the Stock Repurchase Agreement, "it must be clear that a novation is intended."[89] North Carolina law, which governs the Separation Agreement, has similar requirements.[90]

The Stock Repurchase Agreement lacks such clear intent. Rather, it repeatedly incorporates and relies upon the Separation Agreement. The Stock Repurchase Agreement's recitals, for example, state that the repurchase is occurring "[p]ursuant to the Separation Agreement."[91] Section 1 provides that the repurchase is "[i]n accordance with the Separation Agreement."[92] And Section 8 acknowledges, "[f]or the avoidance of doubt," that "the Separation Agreement contains conditions to the Company's obligations under th[e] [Stock Repurchase] Agreement."[93]

---

[88] Am. Compl. ¶ 21.

[89] *See Schwartz v. Centennial Ins.*, 1980 WL 77940, at *3 (Del. Ch. Jan. 16, 1980).

[90] *Kirby Bldg. Sys., Inc. v. McNiel*, 393 S.E.2d 827, 832 (N.C. 1990) ("The intention of the parties to effectuate a novation must be clear and definite, for novation is never to be presumed.").

[91] Stock Repurchase Agreement 1 (Recital D).

[92] *Id.* § 1.

[93] *Id.* § 8.

These provisions establish that the Stock Repurchase Agreement was an implementing document designed to execute the transaction contemplated by the Separation Agreement, not a novation that extinguished it. Armaments acknowledges as much, alleging that the Stock Repurchase Agreement and Note "supplanted and replaced the Separation Agreement's provisions with respect to Armaments' purchase of O'Neil's stock."[94] This dispute arises from the valuation obligations in the Separation Agreement, which are distinct from the stock transfer executed by the Stock Repurchase Agreement.

\* \* \*

Because the Stock Repurchase Agreement did not extinguish the Separation Agreement, O'Neil's claims regarding the 2024 valuation process and his demand for the return of shares arise under the Separation Agreement. The North Carolina Action does not involve claims "under or in relation to" the Stock Repurchase Agreement. Thus, O'Neil did not breach the Stock Repurchase Agreement's forum selection clause by suing in North Carolina.

Because there is no reasonably conceivable claim for breach of contract, Count II is dismissed with prejudice under Rule 12(b)(6). This dismissal moots Armaments' motion for a preliminary anti-suit injunction, which is denied on that basis.

---

[94] Am. Compl. ¶ 21.

## C. Declaratory Judgment

Having determined that the Stock Repurchase Agreement and its forum selection clause do not govern the valuation dispute, I turn to Count I. In Count I, Armaments seeks a declaratory judgment confirming the results of the 2024 valuation and invalidating O'Neil's notice of rescission.[95]

O'Neil moves to dismiss this count for two reasons. First, he argues that dismissal is warranted under Rule 12(b)(3) on *forum non conveniens* grounds.[96] Second, he contends that dismissal is appropriate as a matter of judicial discretion.[97] I agree with both arguments. The valuation dispute is more appropriately heard in North Carolina, and Armaments' declaratory judgment claim is overripe.

### 1. *McWane* Deference Does Not Apply

Armaments argues that the court should not undertake a *forum non conveniens* analysis because this suit is entitled to first-filed priority under the *McWane* doctrine.[98] It insists that it filed this suit only after settlement discussions stalled,

---

[95] *Id.* ¶¶ 46-50.

[96] "When addressing a motion under Rule 12(b)(3), 'the court is not shackled to the plaintiff's complaint and is permitted to consider extrinsic evidence from the outset.'" *In re Bay Hills Emerging P'rs I, L.P.*, 2018 WL 3217650, at *4 (Del. Ch. July 2, 2018) (citation omitted).

[97] Def.'s Opening Br. 40-44; Def.'s Reply Br. 31.

[98] Pl.'s Opp'n Br. 37; *see McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281, 283 (Del. 1970).

diligently obtained a summons, and promptly served O'Neil.[99] But the timing of Armaments' suit is suspect. Delaware courts decline to afford *McWane* deference where a "first-filed" complaint is a result of a "race to the courthouse" or "anticipatory" filing.[100]

Armaments filed this action on August 21, 2025, moments after O'Neil told Armaments' CEO that he had retained North Carolina counsel and intended to file suit.[101] Armaments then waited to notify O'Neil of the suit until after O'Neil filed and served his North Carolina complaint.[102] This is the sort of "tactical maneuver[ing]" that strips a plaintiff of first-filed priority.[103] Regardless, the suits are four days apart and are more appropriately treated as contemporaneously filed.[104] I therefore proceed to the traditional *forum non conveniens* analysis.

---

[99] *See* Pl.'s Opp'n Br. 37-40.

[100] *Nokia Sols. & Networks Oy v. Collision Commc'ns, Inc.*, 2020 WL 2095829, at *4 (Del. Super. Apr. 30, 2020) ("Delaware courts 'take[] a rather dim view of tactical maneuvers and improper manipulation of the litigation process by parties seeking to invoke the principles of comity and efficiency underlying [*McWane*].'" (citation omitted)).

[101] *Compare* Aff. of William O'Neil (Dkt. 10) ("O'Neil Aff.") ¶ 16(c) (recounting 12:16 pm, August 21, 2025 call with CEO), *with* Compl. (Dkt. 1) (e-filed at 12:37 pm on August 21, 2025).

[102] O'Neil Aff. ¶¶ 17-21.

[103] *Rapoport v. Litig. Tr. of MDIP Inc.*, 2005 WL 3277911, at *4 (Del. Ch. Nov. 23, 2005).

[104] *See In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 116 (Del. Ch. 2009) ("Because the actions were filed only a few days apart, I consider them contemporaneous.").

## 2. *Forum Non Conveniens* Analysis

Under the doctrine of *forum non conveniens*, the court considers the *Cryo-Maid* factors: (1) the relative ease of access to proof; (2) the availability of compulsory process for witnesses; (3) the possibility of the view of the premises; (4) whether the controversy is dependent upon the application of Delaware law; (5) the pendency or non-pendency of a similar action or actions in another jurisdiction; and (6) all other practical problems that would make the trial of the case easy, expeditious and inexpensive.[105] To prevail, a defendant must meet the burden of showing that litigating in Delaware would cause an "overwhelming hardship."[106] O'Neil has met that burden here.

First, the factors pertaining to access to proof and witnesses favor North Carolina. O'Neil, the primary witness, resides in North Carolina, where the Separation Agreement was executed and performed.[107] Armaments' principal place of business is in Maryland, and the office of Moss Adams that performed the

---

[105] *Martinez v. E.I. DuPont de Nemours & Co.*, 86 A.3d 1102, 1104 (Del. 2014); *see also Gen. Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681, 684 (Del. 1964).

[106] *Martinez*, 86 A.3d at 1104-05.

[107] Am. Compl. ¶ 3; Separation Agreement § 18 ("This Agreement will be deemed to have been entered into and will be construed and enforced in accordance with the laws of the State of North Carolina as applied to contracts made and to be performed entirely within North Carolina.").

valuation is in Washington state.[108]  There are no apparent witnesses or evidence in Delaware.[109]  Forcing an individual defendant to litigate in a forum where he lacks contacts, while Armaments is already actively litigating in his home state of North Carolina, presents a hardship to him.[110]

Second, the choice of law factor favors North Carolina.  As described above, the Separation Agreement governs the valuation dispute.  That agreement is governed by North Carolina law.[111]  Although "Delaware courts are accustomed to applying the laws of sister states," this factor adds "little—but some—weight" toward dismissal.[112]

Finally, the pendency of the parallel North Carolina Action strongly counsels in favor of dismissal.  The suit there involves the same parties and encompasses a more comprehensive set of claims.[113]  The North Carolina court can provide complete justice.  If it holds that Armaments breached the Separation Agreement and the Note, its ruling will moot Armaments' request for declaratory relief here.  The

---

[108]Am. Compl. ¶ 1; North Carolina Mot. to Dismiss 22.  O'Neil's briefing asserts that Armaments' principal place of business is in Virginia, but I rely on the allegations in the Amended Complaint.  *See* Def.'s Opening Br. 36.

[109] O'Neil Aff. ¶¶ 6-7.

[110] *See* Def.'s Opening Br. 37-38.

[111] Separation Agreement § 18.

[112] *GXP Cap., LLC v. Argonaut Mfg. Servs., Inc.*, 234 A.3d 1186, 1197 (Del. Super. 2020), *aff'd*, 253 A.3d 93 (Del. 2021).

[113] North Carolina Compl. ¶¶ 41-78.

reverse, however, is not true. The North Carolina Action seeks affirmative remedies—including the return of shares and monetary damages—that go beyond a mere determination of the notice of rescission's validity and the proper valuation.[114]

### 3. Overripeness

Dismissal is also appropriate under this court's inherent discretion regarding declaratory judgments. The availability of a declaratory judgment requires a ripe, actual controversy.[115] Delaware courts may decline jurisdiction where a declaratory judgment action is "overripe"—that is, where the dispute has matured to the point where a coercive remedy is available and being pursued in another forum.[116]

In *Burris v. Cross*, the Superior Court identified seven factors that bear on the "appropriateness of a declaratory judgment action":

> (1) Whether the defendant is truly an unwilling litigant, thus necessitating declaratory action[;]
>
> (2) What form of relief is truly being sought by the plaintiff and whether that relief, if not solely a declaration of rights, would require resort to another court for supplemental relief. If so, whether both the rights and relief could be attained in a single non-declaratory action already available[;]

---

[114] *Compare* Am. Compl. ¶¶ 46-50, *with* North Carolina Compl. ¶¶ 71-78.

[115] *See Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662-63 (Del. 1973) (listing four factors that Delaware courts consider in determining whether a declaratory judgment involves an actual controversy).

[116] *Burris v. Cross*, 583 A.2d 1364, 1372 (Del. Super. 1990); *see also Markusic v. Blum*, 2021 WL 2456637, at *4-5 (Del. Ch. June 16, 2021) (ORDER), *aff'd*, 284 A.3d 1017 (Del. 2022).

(3) Whether another remedy exists and whether it would be more effective or efficient and, thus, whether declaratory judgment would serve a useful purpose[;]

(4) Whether another action is pending, instituted either before or after the instant action, at the time of consideration of the Motion to Dismiss, and whether plaintiff would be able to raise all claims and defenses available in the instant action, as part of the pending action[;]

(5) Whether the instant action has truly been instituted to seek a declaration of rights or merely for tactical or other procedural advantage[;]

(6) Whether the instant action was filed in apparent anticipation of other pending proceedings[;]

(7) Whether plaintiff will suffer any prejudice if the instant action is dismissed.[117]

These factors favor dismissal.

O'Neil is the natural plaintiff in this dispute. He complains of affirmative harm from Armaments' failure to pay the Note and follow the valuation process. He is also a willing litigant who filed a breach of contract claim in another jurisdiction seeking coercive relief.[118]

A declaratory judgment here would serve no useful purpose. It would only interfere with O'Neil's choice of forum. As mentioned, the North Carolina Action,

---

[117] *Burris*, 583 A.2d at 1372-73.

[118] North Carolina Compl. ¶¶ 46-50.

which seeks damages and the return of shares, will necessarily resolve the questions of whether the valuation was proper and whether the rescission notice was valid.[119]

Litigating the same valuation dispute in two forums is inefficient.[120] Because the Separation Agreement controls, and O'Neil has invoked that agreement in North Carolina, judicial economy favors allowing that action to proceed.

*      *      *

Armaments filed this suit in anticipation of O'Neil's North Carolina Action to secure a tactical advantage. The dispute centers on the Separation Agreement governed by North Carolina law—not the Stock Repurchase Agreement governed by Delaware law. A parallel suit is pending in an appropriate forum that will fully resolve the controversy. I therefore decline to exercise jurisdiction over the

---

[119] *See supra* notes 113-114 and accompanying text; *see also Clemente v. Greyhound Corp.*, 155 A.2d 316, 321 (Del. Super. 1959) (noting that a court may decline jurisdiction over a declaratory judgment action when there are other, more "effective" tools available for resolving the underlying dispute).

[120] *See Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1242 (Del. Ch. 1987) (noting that courts must weigh "special considerations relating to the efficient use of judicial resources" and avoid a "waste of judicial resources" when exercising declaratory judgment jurisdiction); *Burris*, 583 A.2d at 1375 (discussing "the horrors of simultaneous adjudication" (citation omitted)).

declaratory judgment claim and dismiss Count I without prejudice to Armaments' right to assert it as a counterclaim in the North Carolina Action.

## III.  CONCLUSION

The motion to dismiss under Rule 12(b)(2) is denied.  The motion to dismiss is granted as to Count II, which is dismissed with prejudice under Rule 12(b)(6). The motion to dismiss is also granted as to Count I, which is dismissed without prejudice under Rule 12(b)(3) and because the declaratory judgment claim is overripe.  Armaments' motion for a preliminary injunction is denied as moot.